# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN BEHRMANN and NANCY BEHRMANN, Derivatively on Behalf of Nominal Defendant DENTSPLY SIRONA INC., | ) ) ) ) | CASE NO.: **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| | ) | |
| Plaintiffs, | ) ) | |
| ERIC K. BRANDT, MICHAEL C. ALFANO, DAVID K. BEECKEN, MICHAEL J. COLEMAN, WILLIE A. DEESE, THOMAS JETTER, ARTHUR D. KOWALOFF, HARRY M. JANSEN KRAEMER, JR., and FRANCIS J. LUNGER, | ) ) ) ) ) ) ) ) | |
| | ) ) | |
| v. | ) ) | |
| Defendants, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| DENTSPLY SIRONA INC., a Delaware Corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | |

Plaintiffs John and Nancy Behrmann ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Dentsply Sirona Inc. ("Dentsply" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Dentsply with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst

reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of Dentsply, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from February 20, 2014 to the present (the "Relevant Period").  Defendants' actions have caused, and will continue to cause, substantial financial harm and other damages to Dentsply, including damages to its reputation and goodwill.

2.      Dentsply represents itself as ". . . the world's largest manufacturer of professional dental products and technologies, with a 132-year history of innovation and service to the dental industry and patients worldwide."  When describing its business, the Company states that it ". . . develops, manufactures, and markets comprehensive solutions offering including dental and oral health products as well as other consumable medical devices under a strong portfolio of world class brands."[1]

3.      Dentsply exists as the result of a merger between Dentsply International Inc. ("Dentsply Intl.") and Sirona Dental Systems, Inc. ("Sirona"), which merger closed on February 29, 2016 (the "Dentsply/Sirona merger").  Dentsply Intl. and/or Sirona are also referred to herein as "predecessors".

4.      As more fully described herein, throughout the Relevant Period, Dentsply and/or its predecessors made repeated material misrepresentations and/or failed to disclose the true condition of its business and business prospects.  These

---

[1]      *See* Dentsply's Form 10-K, filed with the SEC on March 3, 2019 (the "2018 10-K), at p. 3.

material misrepresentations and/or omissions include the Company's failure to disclose the existence of an alleged antitrust scheme by and between three (3) of this industry's largest distributors, accounting for 80% to 85% of all dental market sales, to reduce competition in the dental supply market, and to maintain the sales price of dental supplies at artificially inflated levels. This alleged antitrust scheme also served to artificially inflate sales and margins of Dentsply and its predecessors.

5. These material misrepresentations and/or omissions also include the Company's failure to disclose the true impact of its predecessor's agreement with one of these distributors, which agreement included minimum purchase requirements and provided for exclusive distribution. This exclusivity combined with minimum purchase requirements was not sustainable, which was known or recklessly disregarded by the Director Defendants.

6. Dentsply made a series of "corrective" and other disclosures on August 9, 2017, October 2, 2017, March 15, 2018, May 6, 2018, and August 7, 2018, which included three separate goodwill impairment charges totaling $3.3 billion.

7. Collectively, Dentsply's conduct as alleged herein, and the impact of these disclosures resulted in Dentsply's stock price declining by over 45% from its Relevant Period high.

8. The misconduct of Dentsply and its officers and directors has also subjected it to multiple securities class actions and other litigation including *Boyton Beach General Employees' Pension Plan v. Dentsply Sirona, Inc., et al.*, Case No. 2:18-cv-07253 (E.D.N.Y.) (the "Securities Class Action").

## JURISDICTION AND VENUE

9. Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule

14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i)  the Company is incorporated in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Dentsply, occurred in this District; and (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiffs

12.     ***Plaintiffs John and Nancy Behrmann*** ("Plaintiff") are current Dentsply shareholder during the Relevant Period.  Plaintiffs will continue to hold at least 500,000 Dentsply shares throughout the pendency of this action.  Plaintiffs will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

13.     Nominal Defendant Dentsply develops, manufactures, and markets a broad range of consumable dental products and technologically-advanced dental equipment.  The Company also manufactures and markets other consumable medical device products. The Company is incorporated in Delaware and maintains its

principal executive offices at 221 West Philadelphia Street, York, Pennsylvania. Dentsply securities trade on the NASDAQ under the ticker symbol "XRAY".

**Director Defendants**

14.     ***Defendant Eric K. Brandt*** ("Brandt) is a director of the Company.  He has served as a member of the Board since 2004.  Brandt has served as Non-Executive Chairman of the Board since September 28, 2017.  Brandt served as a member of the Audit Committee in 2016, post-Dentsply/Sirona merger.  He has continuously served on the Corporate Governance and Nominating Committee since 2017.  Brandt has been the Chairman of the Executive Committee since 2018.  He has also continuously served as a member of its Corporate Governance and Nominating Committee since 2017.   Since 2014, Brandt has received total compensation of $1,253,870.00 for serving as a director of Dentsply or its predecessor and as a member or Chairman of its various committees.

15.     ***Defendant Michael C. Alfano*** ("Alfano") is a director of the Company. He has served as a member of the Board since 2001.  Alfano has continuously served as a member of its Corporate Governance and Nominating Committee since 2015 and was its Chairman in 2016 (post-Dentsply /Sirona merger) and 2017.  Alfano was a member of the Company's Human Resources Committee from at least 2014 through 2016 (pre-Dentsply /Sirona merger).  Since 2014, Alfano has received total compensation of $1,202,750.00 for serving as a director of Dentsply or its predecessor and as a member or Chairman of its various committees.

16.     ***Defendant David K. Beecken*** ("Beecken") is a director of the Company.  He has served as a member of the Board since 2016.  Beecken has continuously served as a member of the Audit Committee since 2016, post-Dentsply/Sirona merger.  He also served as a member of the Company's Human Resources Committee in 2016 (post-Dentsply/Sirona merger).  Since 2016 (post-

Dentsply/Sirona merger).  Beecken has received total compensation of $773,750.00 for serving as a director of Dentsply and as a member of its various committees.

17.      Per Dentsply's Form DEF 14A filed with the SEC on April 12, 2019 (the "2019 Proxy Statement"), Beecken will not be standing for re-election to the Board at the annual meeting, which meeting is presently scheduled for May 22, 2019.

18.      Prior to joining the Dentsply Board of Directors, Beecken was a director of Sirona since 2006.  At all times relevant herein, while serving as a director on Sirona's Board, Beecken was Chairman of Sirona's Audit Committee.

19.      ***Defendant Michael J. Coleman*** ("Coleman") is a director of the Company.  He has served as a member of the Board since 1991.  Mr. Coleman has continuously served as a member of its Human Resources Committee since at least 2014 and was its Chairman in from 2014 through 2016 (pre-Dentsply/Sirona merger).  Since 2014, Coleman has received total compensation of $1,204,750.00 for serving as a director of Dentsply or its predecessor and as a member or Chairman of its various committees.

20.      Per Dentsply's 2019 Proxy Statement, Coleman will be retiring from the Board of Directors as of the date of the annual meeting, which meeting is presently scheduled for May 22, 2019

21.      ***Defendant Willie A. Deese*** ("Deese") is a director of the Company.  He has served as a member of the Board since 2011.  Deese was a member of the Company's Audit and Finance Committee from at least 2014 through 2016 (pre-Dentsply/Sirona merger).  He was also a member of the Company's Corporate Governance and Nominating Committee in 2016 (post-Dentsply/Sirona merger).  Deese has been a member of the Company's Human Resources Committee since 2017 and has been its Chairman since 2018.  Since 2014, Deese has received total

6

compensation of $1,209,875.00 for serving as a director of Dentsply or its predecessor and as a member or Chairman of its various committees.

22.     **Defendant Thomas Jetter** ("Jetter") is a director of the Company. He has served as a member of the Board since 2016 (post-Dentsply/Sirona merger). Jetter has continuously served as a member of the Corporate Governance and Nominating Committee since 2016 (post-Dentsply/Sirona merger). Since 2016 (post-Dentsply/Sirona merger), Jetter has received total compensation of $797,500.00 for serving as a director of Dentsply and as a member of its various committees.

23.     Per Dentsply's 2019 Proxy Statement, Jetter will not be standing for re-election to the Board at the annual meeting, which meeting is presently scheduled for May 22, 2019.

24.     Prior to joining the Dentsply Board of Directors, Jetter was a director of Sirona since 2010. At all times relevant herein, while serving as a director on Sirona's Board, Jetter was a member of Sirona's Nominating and Corporate Governance Committee. He was also a member of the Company's Executive Committee in 2016 (post-Dentsply/Sirona merger).

25.     **Defendant Arthur D. Kowaloff** ("Kowaloff") is a director of the Company. He has served as a member of the Board since 2016 (post-Dentsply/Sirona merger). Kowaloff has continuously served as a member of the Human Resources Committee since 2016 (post-Dentsply/Sirona merger) and as its Chairman in 2016 and 2017. Kowaloff has received total compensation of $792,500.00 for serving as a director of Dentsply and as a member or Chairman of its Human Resources Committee.

26.     Prior to joining the Dentsply Board of Directors, Kowaloff was a director of Sirona since 2006. At all times relevant herein, while serving as a director

on Sirona's Board, Kowaloff was a member of Sirona's Audit Committee, Nominating and Corporate Governance Committee, and Compensation Committee.

27.     ***Defendant Harry M. Jansen Kraemer, Jr.*** ("Kraemer") is a director of the Company.   He has served as a member of the Board since 2016.  Kraemer has continuously served as a member of the Corporate Governance and Nominating Committee since 2016 (post-Dentsply/Sirona merger) and as its Chairman since 2018.  Kraemer has received total compensation of $760,000.00 for serving as a director of Dentsply and as a member or Chairman of its Corporate Governance and Nominating Committee.

28.     Prior to joining the Dentsply Board of Directors, Kraemer was a director of Sirona since 2006.  At all times relevant herein, while serving as a director on Sirona's Board, Kraemer was a Chairman of Sirona's Nominating and Corporate Governance Committee and was a member of its Compensation Committee.

29.     ***Defendant Francis J. Lunger*** ("Lunger") is a director of the Company. He has served as a member of the Board since 2005.  Lunger is and has been Chairman of the Company's Audit and Finance Committee since at least 2014.  He has also been a member of its Executive Committee since 2015 (with the possible exception of 2017 as more fully discussed under Dentsply Corporate Governance below).  Since 2014, Lunger has received total compensation of $1,291,500.00 for serving as a director of Dentsply or its predecessor and as a member or Chairman of its various committees.

30.     Defendants Brandt, Alfano, Beecken, Coleman, Deese, Jetter, Kowaloff, Kraemer, and Lunger are collectively referred to herein as the "Director Defendants".  Attached hereto as Exhibit A is a chart entitled "Dentsply Committee Membership" providing committee membership information for each Dentsply director from 2014 to the present.  Attached hereto as Exhibit B is a chart entitled

"Dentsply Director Compensation" providing total compensation information for each Dentsply director from 2014 through 2018.

**Non-Party Directors and Officers**

31.    ***Donald M. Casey Jr.*** ("Casey") serves as Dentsply's Chief Executive Officer ("CEO") and is also a director of the Company.   He has served as a member of the Board since 2018.

32.    ***Betsy D. Holden*** ("Holden") is a director of the Company.   She has served as a member of the Board since January 2018.  Holden has served as a member of the Company's Human Resources Committee and Executive Committee since 2018.

33.    ***Leslie F. Varon*** ("Varon") is a director of the Company.  She has served as a member of the Board since January 2018.  Varon has been a member of the Company's Audit and Finance Committee since 2018.

34.    ***Jeffrey T. Slovin*** ("Slovin") was a director and the president and CEO of Sirona at the time of the Dentsply/Sirona merger.  While at Sirona, Slovin served as it's CEO from February 2013 through February 2016, and as its President from September 20, 2010 through February 28, 2016.

35.    Immediately following the completion of the Dentsply/Sirona merger, Slovin became CEO of Dentsply and a member of its Board of Directors.

36.    On October 2, 2017 the Company announced the resignation of Slovin from all his positions at Dentsply.  While at Dentsply (for part of 2016 and 2017), Slovin received total compensation of $13,132,914.00.

37.    ***Bret W. Wise*** ("Wise") served as a member of Dentsply's Board since 2006, as its Chairman since 2007, and as it's CEO since January 1, 2007.  Wise was the CEO and Chairman of the Board of Dentsply at the time of the Dentsply/Sirona

merger.  Immediately following the completion of the Dentsply/Sirona merger, Wise continued as Dentsply's Chairman of the Board.

38.     On October 2, 2017 the Company announced the resignation of Wise from all his positions at Dentsply.  From 2014 through October 2017, Wise received total compensation of $24,459,082.00.

39.     ***Paula H. Cholmondeley*** ("Cholmondeley") served as a member of the Company's Board from 2001 through February 29, 2016.  Dentsply announced the retirement of Cholmondeley effective February 29, 2016, which coincides with its announced closing of the Dentsply/Sirona merger.  Cholmondeley was a member of the Company's Corporate Governance and Nominating Committee from at least 2014 through February 29, 2016.

40.     ***William F. Hecht*** ("Hecht") served as a member of the Company's Board from 2001 through February 29, 2016.  Dentsply announced the retirement of Hecht effective February 29, 2016, which coincides with its announced closing of the Dentsply/Sirona merger.  Hecht was the Chairman of the Company's Corporate Governance and Nominating Committee from at least 2014 through February 29, 2016 and a member of its Executive Committee during the same time period.

41.     ***John Miclot*** ("Miclot") served as a member of the Company's Board from 2010 through February 29, 2016.  Dentsply announced the retirement of Miclot effective February 29, 2016, which coincides with its announced closing of the Dentsply/Sirona merger.  Miclot was a member of the Company's Audit and Finance Committee from at least 2014 through February 29, 2016.

42.     ***John C. Miles II*** ("Miles") served as a member of the Company's Board from 1990 through February 29, 2016.  Dentsply announced the retirement of Miles effective February 29, 2016, which coincides with its announced closing of the

Dentsply/Sirona merger.   Miles was a member of the Company's Executive Committee from at least 2014 through February 29, 2016.

43.     **Leslie A. Jones** ("Jones") served as a member of the Company's Board from 1983 through May 20, 2015, the date of the Company's annual shareholder's meeting.   Jones was a member of the Company's Corporate Governance and Nominating Committee and Executive Committee from at least 2014.

44.     **Christopher T. Clark** ("Clark") was the President and Chief Financial Officer ("CFO") of Dentsply Intl. from April 2013 through the time of the Dentsply/Sirona merger, and became the President and Chief Operating Officer ("COO") – Technology of Dentsply in connection with and immediately after the Dentsply/Sirona merger.   On October 2, 2017, the Company announced the resignation of Clark from all his positions at Dentsply.

45.     **James G. Mosch** ("Mosch") was the COO of Dentsply Intl. from April 2013 through the time of the Dentsply/Sirona merger and became the President and COO – Dental and Healthcare Consumables of Dentsply in connection with and immediately after the Dentsply/Sirona merger.  On February 10, 2017, the Company announced the resignation of Mr. Mosch from all his roles at Dentsply effective as of June 30, 2017.

46.     **Ulrich Michel** ("Michel") was the CFO of Sirona from October 2013 through the time of the Dentsply/Sirona merger and became CFO of Dentsply Sirona in connection with and immediately after Dentsply/Sirona merger.  On November 2, 2017, the Company announced the resignation of Michel from all his roles at Dentsply, effective as of November 10, 2017.

47.     **Nicholas W. Alexos** ("Alexos") is the current Executive Vice President and CFO of Dentsply and has served in this role since November 10, 2017.  Alexos previously served on the Board of Directors of Sirona.

## DENTSPLY CORPORATE GOVERNANCE

48.     As members of Dentsply's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

49.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dentsply, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

50.     As stated in Dentsply's 2019 Proxy Statement:

> Our Board has four standing committees, the Audit and Finance Committee, the Corporate Governance and Nominating Committee, the Human Resources Committee, and the Executive Committee. In September 2018, the Board formed an unchartered Ad Hoc Committee which was subsequently dissolved in March 2019 at which time the Executive Committee was initially formed. Each committee, with the exception of the Ad Hoc Committee, has a written charter which is reviewed at least annually to reflect the activities of each of the respective committees, changes in applicable law or other relevant considerations, with any changes approved by the full Board. Each committee, with the exception of the Executive Committee, is composed entirely of directors deemed to be, in the judgment of our Board, independent in accordance with the listing standards of The Nasdaq Global Select Market […].

51.     Notwithstanding Dentsply's representation that its Executive Committee was "initially formed" in in 2019 following the dissolution of its short-lived Ad Hoc Committee, a Dentsply (or Dentsply Intl.) Executive Committee is identified and discussed in each of its Form DEF 14A's filed with the SEC in 2014, 2015, 2016, and 2017.  Dentsply's Form DEF 14A filed with the SEC in 2018 is silent regarding its Executive Committee.

**Code of Business Conduct and Ethics**

52.    Dentsply maintains a Code of Business Conduct and Ethics which it refers to as the "Dentsply Sirona Code".  The Dentsply Sirona Code is undated and there is no indication this Code has been revised, amended, or updated.  However, when downloaded, its pre-selected naming convention includes the date "10.02.17". Additionally, since its title page identifies Dentsply Sirona rather than its pre-merger name, Plaintiffs are informed and believes that the Dentsply Sirona Code was created after the Dentsply/Sirona merger.

53.    The Dentsply Sirona Code provides in relevant part:

Dentsply Sirona demonstrates an unwavering commitment to performance with integrity.  We are a leader in the dental industry and this comes with responsibility.  Each of our Dentsply Sirona employees needs to make good ethical decisions that lead to positive action. Dentsply Sirona must earn the trust of our customers and investors every day, through the actions of our employees.

* * *

Our Dentsply Sirona business leaders are responsible for their own actions and for fostering a culture consistent with our Code of Business Conduct and Ethics, policies and applicable laws […].

Excellent financial performance and high standards of governance and compliance are equally important and valuable.

* * *

**Who must follow the Dentsply Sirona Code and policies**

Dentsply Sirona directors, officers, and employees of all Dentsply Sirona entities, including subsidiaries and controlled affiliates, must follow the Dentsply Sirona Code and all compliance policies […].

54.     The Dentsply Sirona Code also discusses required compliance with antitrust and competition laws and requires compliance with all applicable competition laws and regulations.   This section of the Dentsply Sirona Code evidence's the Company's awareness of and sensitivity to the impact of antitrust schemes, specifically alerting its officers and directors of risks associated with "exclusive arrangements" and "distribution arrangements".

55.     The Dentsply Sirona Code also discusses the Company's responsibilities regarding its financial records and reporting.   It requires that its officers, directors and employees "Ensure That Financial and Non-Financial Information and operating metrics are reported accurately and in a timely fashion" and "Provide Timely, Candid Forecasts and assessments".

**Audit and Finance Committee Charter**

56.     Pursuant to the Company's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board with oversight of the Company's accounting and financial reporting ". . . disclosures, . . . information technology activities, internal audit activities, risk management activities relating to financial matters, . . . and the Company's process for monitoring compliance with laws and regulations and the Company's Code of Business Conduct and Ethics."

57.     The Audit and Finance Committee Charter states in relevant part:

**FUNCTIONS**

**Financial Oversight and Reporting**. The Committee shall have the role and responsibility for monitoring and overseeing the management, gathering and reporting of financial data and information…

\* \* \*

To review and discuss with management, internal audit and the independent accountants, in separate meetings if the Committee deems it appropriate:

the annual audited financial statements, related footnotes and other financial information to be included in the Company's Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), prior to the filing of the Form 10-K and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K;

the quarterly financial statements, related footnotes and other financial information to be included in the Company's Form 10-Q, including the Company's disclosures under MD&A, prior to the filing of the Company's Form 10-Q;

any major issues regarding significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes to the Company's internal control over financial reporting or to the Company's selection or application of accounting principles and major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of material control deficiencies;

analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

* * *

significant, complex or unusual transactions and their impact on the financial statements;

* * *

risk of fraud and the implementation and existence of fraud control.

* * *

To discuss with the Company's management, internal audit and independent accountants the Company's significant accounting and financial reporting controls, any major issues as to the adequacy of the Company's internal control over financial reporting, the Company's disclosure controls and procedures, and any special audit steps adopted in light of material control deficiencies. Obtain annually in writing from the independent accountants their letter as to the adequacy of such controls.

\* \* \*

To discuss with management the Company's policies with respect to earnings press releases and all financial information, such as earnings guidance, provided to analysts and rating agencies, including the types of information to be disclosed and the types of presentations to be made and paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information. The Committee or its Chair may review any of the Company's earnings press releases on a quarterly basis or as the Committee or the Chair deems appropriate.

To discuss with management and internal audit the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

**Human Resources Committee Charter**

58.     Pursuant to the Company's Human Resources Committee Charter, the purpose of the Human Resources Committee is to ". . . provide general oversight and assistance to the Board relating to all compensation plans, policies and programs of the Company, including specifically the compensation of the Chief Executive Officer (the "CEO") and the Company's other executive officers (collectively, including the CEO, the "Executive Officers").

59.     Although Dentsply's 2019 Proxy Statement states that it has implemented a Clawback policy allowing recoupment of compensation[2], no such policy is mentioned in the Human Resources Committee Charter.

60.     Interestingly, when justifying executive compensation, Dentsply's 2019 Proxy Statement (and other of its proxy statements) list of "Peer Group" includes Henry Schein, Inc. and Patterson Companies, Inc., which companies allegedly are parties to an antitrust scheme benefitting Dentsply and as more fully discussed *infra*.

**Corporate Governance and Nominating Committee Charter**

61.     Pursuant to the Company's Corporate Governance and Nominating Committee Charter, the purpose of the Corporate Governance and Nominating Committee includes establishing policies and procedures for the governance of the Company and the Board.

62.     The Corporate Governance and Nominating Committee Charter states in relevant part:

> The Committee shall have the following specific responsibilities, which such responsibilities shall be exercised subject to and in accordance with the Company's By-laws and Corporate Governance Guidelines/Policies:
>
> * * *
>
> Periodically review the Company's corporate governance documents, including the Company's Corporate Governance Guidelines/Policies, the Company's certificate of incorporation and By-laws, and make recommendations to the Board with respect to changes to the Corporate Governance Guidelines/Policies and other governance documents that the Committee deems appropriate.

---

[2]     A similar representation is made in Dentsply's Form DEF 14A filed with the SEC on April 9, 2018 (the "2018 Proxy Statement").

63. Although Dentsply's 2019 Proxy Statement states that it has implemented a Clawback policy allowing recoupment of compensation, no such policy is mentioned in the Corporate Governance and Nominating Committee Charter or in its Corporate Governance Guidelines/Policies.

64. Dentsply's Corporate Governance Guidelines/Policies identify the functions and responsibilities of the Board of Directors which includes:

> Oversight of the conduct of the Company's business and evaluation of whether the business is being properly managed;

> Review and, where appropriate, approval of the Company's objectives, plans and actions, including its longer term strategic plans;

> Review of the Company's financial statements;

> Assessment of major risk factors relating to the Company and its performance, and review of measures taken or intended to be taken to address and mitigate such risks;

> Reviewing and assessing the processes and policies in place for maintaining the integrity of the Company, including the integrity of its financial statements, the integrity of its compliance with law, ethics and the Company's own Code of Business Conduct and Ethics, and the integrity of its relationships with employees, customers and suppliers; and

> Maintenance of, and the Audit Committee will oversee compliance with, the Company's Code of Business Conduct and Ethics

## DUTIES OF THE DIRECTOR DEFENDANTS

65. By reason of their positions as officers, directors, and/or fiduciaries of Dentsply and because of their ability to control the business and corporate affairs of Dentsply, the Director Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use

their utmost ability to control and manage Dentsply in a fair, just, honest, and equitable manner.    The Director Defendants were and are required to act in furtherance of the best interests of Dentsply and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

66.    Each director and officer of the Company owes to Dentsply and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

67.    The Director Defendants, because of their positions of control and authority as directors and/or officers of Dentsply, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Dentsply, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Dentsply.

68.    To discharge their duties, the officers and directors of Dentsply were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Dentsply were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Dentsply conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(e)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

69.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dentsply, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

70.     In addition, as officers and/or directors of a publicly held company, Defendants had a duty not to advance their own personal, financial, or economic interests over, and at the expense of, the Company's public shareholders, or to allow other Dentsply directors, officers, and/or employees to do so.

71.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*. The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the Securities Class Action (and related lawsuits).   As a result, Dentsply has expended, and will continue to expend, significant sums of money.

72.     The Director Defendants' actions have irreparably damaged Dentsply's corporate image and goodwill.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

73.     In committing the wrongful acts alleged herein, the Director Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Director Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

74.     During all times relevant hereto, the Director Defendants, collectively and individually, initiated or allowed a course of conduct that was designed to and did deceive the investing public, including stockholders of Dentsply, regarding the valuation of its goodwill, its business and business prospects discussed herein.  In furtherance of this plan, conspiracy, and course of conduct, the Director Defendants, collectively and individually, took the actions set forth herein.

75.     The Director Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Director Defendants caused the Company to issue false and misleading press releases and other public filings as alleged herein.

76.     The purpose and effect of the Director Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Director Defendants' violations of law and breaches of fiduciary duty, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

77.     The Director Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.   Because the actions described herein occurred under the authority of the Board, each of the Director Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

78.     Each of the Director Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Director Defendant acted with knowledge of the primary wrongdoing, substantially

assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## COMPANY AND OTHER BACKGROUND INFORMATION

79.    Dentsply Intl. was a Delaware corporation which dates its history to 1899.  Its principal product categories were dental consumable products, dental laboratory products, dental specialty products and consumable medical device products.

80.    Sirona dates its own history back to 1882 as a designer, developer, manufacturer, and marketer of technologically-advanced dental equipment.  In its recent past Sirona developed, manufactured and marketed several lines of dental products and had four reporting segments: (i) dental CAD/CAM[3]; (2) imaging systems; (3) treatment centers; and (4) instruments including handheld and power-operated hand-pieces for cavity preparation, endodontics, and periodontology.

81.    As part of Sirona's expansion in its imaging systems business segment, in 2005 Sirona acquired Schick Technologies, Inc. ("Schick").  Schick continued operating under the business name Schick Technologies, Inc. until October 1, 2012, when it was changed to Sirona Dental, Inc.

82.    Starting before the commencement of the Relevant Period and continuing thereafter, the vast majority of Dentsply and its predecessor's products were sold through one of three full-service distributors; Henry Schein, Inc. ("Schein"), Patterson Companies, Inc. ("Patterson") or Benco Dental Supply Co. ("Benco") (collectively, the "Distributors").

83.    Collectively, Benco, Schein, and Patterson control more than 85% of all full-service distributor sales of dental products and services nationwide.

---

[3]    Computer-aided design and manufacturing (CAD/CAM) systems.

Theoretically, Benco, Schein, and Patterson are competitors of one another. Each sells dental supplies and related equipment to a fragmented customer base of independent dentists. In reality, the Distributors were parties to an antitrust scheme more fully discussed and described *infra*.

84.     Prior to completion of the Dentsply/Sirona merger, Dentsply Intl. distributed approximately half of its dental products through third-party distributors but relied heavily on some or all of the Distributors. As stated in its Form 10-K filed with the SEC on February 12, 2016 (the "2015 10-K"), "[i]n 2015, one customer, Henry Schein Incorporated, a dental distributor, accounted for 11% of [Dentsply Intl.]'s consolidated net sales."

85.     Prior to completion of the Dentsply/Sirona merger, in the U.S. and Canada, Patterson had served as the exclusive distributor for Sirona's CAD/CAM products since 1998 and for all Schick and Sirona-branded imaging products since 2005. On information and belief, the following agreements were in effect between Sirona and Patterson prior to completion of the Dentsply/Sirona merger (the "Sirona/Patterson Agreements"):

> a. June 2005 -- Consolidated and Restated Amendment to Distributorship Agreement, which included among other things, a $100 million upfront payment by Patterson to Sirona and to extend exclusivity through 2017. In exchange, Sirona granted Patterson the exclusive right to distribute "current and future CAD/CAM equipment manufactured by Sirona," including the CEREC systems, in the U.S. and Canada;
>
> b. May 31, 2012 -- Amended and Restated U.S. Distributorship Agreement which referenced Schick's assignment of rights to Sirona and granted Patterson the exclusive right to distribute in the

U.S. all Schick and Sirona-branded "imaging products and equipment," Sirona "treatment centers and instruments," and "related spare parts, consumables and repair exchange parts"; and

c. May 12, 2012 -- Amended and Restated U.S. CAD/CAM Distributorship Agreement.

86.     The Sirona/Patterson Agreements included minimum purchase requirements on Patterson as a condition of its exclusive distributor status.  These agreements also imposed detailed reporting requirements on Patterson, pursuant to which Sirona regularly received extensive information concerning Patterson's sales and operations as they related to the distribution and sale of the products subject to those Agreements.

87.     Sirona kept the minimum purchase requirements details secret from Plaintiffs and the investing public.  By way of example, attached as Exhibit C is the Sirona/Patterson May 31, 2012 Amended and Restated U.S. Distributorship Agreement, which displays as "*****" at p. 11 the withheld minimum purchase requirements information, and which is described as "Confidential".

88.     On information and belief, Plaintiffs allege that starting not later than July 2012, Schein, Patterson, and Benco entered into an antitrust scheme which included an agreement to refuse to provide discounts to or compete for the business of Buying Groups for their core customer base of independent dentists.  This antitrust scheme ultimately led to the commencement of an action by the Federal Trade Commission ("FTC") when it filed its complaint against the Distributors on February 12, 2018 entitled *In the Matter of Benco Dental Supply Co., et al*., Docket Number 9379 (the "FTC Complaint").  An unredacted copy of the FTC Complaint filed on March 14, 2018 is attached hereto as Exhibit D.

89.     As described in the FTC Complaint, Buying Groups are organizations of independent dentists that seek to aggregate and leverage the collective purchasing power of separately-owned and separately-managed dental practices in exchange for lower prices on dental products.

90.     The FTC Complaint includes several causes of action for Restraint of Trade against the Distributors.  It lists the anticompetitive effects of the agreement between Schein, Patterson, and Benco (FTC Complaint at ¶ 75) as:

   a.  Unreasonably restraining price competition in the sale of dental products in the United States;

   b.  Distorting prices and undermining the ability of independent dentists to obtain lower prices and discounts for dental products;

   c.  Depriving independent dentists of the benefits of vigorous price and service competition among full-service, national distributors of dental products;

   d.  Unreasonably reducing output of dental products to Buying Groups of independent dentists in the United States;

   e.  Eliminating or reducing the competitive bidding process among the Distributors for sales to Buying Groups of independent dentists in the United States.

91.     Dentsply and its predecessors were among the beneficiaries of this antitrust scheme.

92.     As recounted in the FTC Complaint, an example of the Distributors anticompetitive conduct relates to its actions against the Arizona Dental Association ("AZDA").   As alleged in the FTC Complaint, Schein, Patterson, and Benco discussed withdrawing from the AZDA annual trade show in response to AZDA's creation of a Buying Group in July 2014.  Following communications between the

Distributors in the summer of 2014, all three Distributors withdrew from the AZDA Western Regional Conference. As further alleged in the FTC Complaint, the " . . . Distributors' inter-firm communications and subsequent withdrawal from the… AZDA Trade Show…[is] evidence of their conscious commitment to coordinate their response to the threat of Buying Groups."

93.     Dentsply and/or its predecessors knew of and supported the conduct of the Distributors. By way of example and on information and belief, on July 30, 2014, Benco's Mike Wade exchanged emails concerning the Distributors' boycott plans with respect to an upcoming meeting of the Arizona Dental Association ("AZDA") with Dentsply Intl.'s Senior Territory Manager, Brian Goslee. As Benco's Wade advised: "I have communicated with our competition at Schein and Patterson and we are all of the same mind that we will not be supporting a competitor's [AZDA's] meeting next year."[4]

94.     On information and belief and as alleged in the Securities Class Action, Dentsply and/or its predecessors ". . . acted as a "hub" between the Distributors and as an "enforcer" of the anticompetitive scheme by: (i) engaging in a "misinformation campaign" in which the Company told dentists not to acquire discounted products from "unauthorized" distributors because they were purportedly of a lower quality and dangerous for patients – even though Dentsply Sirona knew the products were identical to those sold by authorized dealers; and (ii) threatening and filing vexatious trademark and tortious interference litigation against "unauthorized" distributors for the purpose of injuring those distributors and preventing them from selling its products."

_____

[4]     *See In Re Dentsply Sirona, Inc. Shareholders Litigation*, Index No. 155393/2018 (Sup. Ct. NY), ¶ 31 (the "Shareholders Litigation Action").

95.     On September 15, 2015, Dentsply Intl. and Sirona issued a joint press release announcing that the ". . . Boards of Directors of both companies have unanimously approved a definitive merger agreement under which the companies will combine in an all-stock merger of equals."

96.     On February 29, 2016, Dentsply announced the completion of the Dentsply/Sirona merger.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### Dentsply Intl. Pre-Dentsply/Sirona Merger
### Materially False and Misleading Statements

97.     Throughout the Relevant Period, Dentsply and its predecessors made materially false and misleading statements in the Company's financial statements filed with the SEC and in earnings calls with analysts and investors. During the Relevant Period, Dentsply never disclosed that its reported sales and margins were enhanced by an anticompetitive conspiracy. Quite the opposite, Dentsply claimed it was able to succeed despite the challenges posed by the "highly competitive" U.S. dental market.

98.     On February 20, 2014, Dentsply Intl. filed its Form 10-K with the SEC for the fiscal year ended December 31, 2013 (the "2013 10-K"). In this 2013 10-K, Dentsply touted its increased sales, improved operating margins, and increased operating cash flow. Dentsply Intl. failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth includes global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

99.   In this 2013 10-K, Dentsply Intl. also made materially false and misleading statements concerning the "highly competitive" U.S. dental market and how it was able to sustain or grow its market share, stating in relevant part:

> The Company conducts its operations, both domestic and foreign, under highly competitive market conditions. Competition in the dental and medical products industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance by professionals, technicians and patients. Dentsply believes that its principal strengths include its well-established brand names, its reputation for high quality and innovative products, its leadership in product development and manufacturing, the breadth of its product line, its commitment to customer satisfaction and support of the Company's products by dental and medical professionals.

100.   On May 6, 2014, Dentsply Intl. filed its Form 10-Q for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").   In this Q1 2014 10-Q, it discussed its increased sales, earnings growth per diluted share, and improved operating margin.   Dentsply Intl. again failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth includes global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

101.   The Q1 2014 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during the most recent quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial

reporting.

102.    On May 6, 2014, Dentsply Intl. participated in a conference call with analysts and investors to discuss its 2014 first quarter financial results:

a.    Clark reported that quarterly adjusted operating margins were 17.7%, and that these margins "reflect[ed] the better leverage and the overall SG&A savings that I just described", and

b.    Wise commented on the Company's quarterly performance and stated that "these results reflect and they're part of an ongoing strategy to grow earnings through better leveraging our portfolio of companies and our cost structure, even in differing economic environments."

103.    On July 31, 2014, Dentsply Intl. filed its Form 10-Q for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  In this Q2 2014 10-Q, it discussed its sales, earnings growth per diluted share, and improved operating margin.  Dentsply Intl. again failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth includes global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

104.    The Q2 2014 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during the most recent quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

105.    On July 31, 2014, Dentsply Intl. participated in a conference call with analysts and investors to discuss its 2014 second quarter financial results.  During the call:

    a.  Wise responded to an analyst's question regarding how much new product launches are contributing year to date by stating that "product launches and new products is a fundamental part of our strategy that's important to the internal growth or the continued growth of the Company."

    b.  Clarke reported that quarterly adjusted operating margins were 19.3% and that the Company was maintaining its adjusted earnings per share guidance in the range of $2.47 to $2.55, which he said factored in the "momentum we believe we are creating relative to our efforts to improve operating efficiency and to drive better leverage of our cost and asset basis."

106.    On October 29, 2014, Dentsply Intl. filed its Form 10-Q for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  In this Q3 2014 10-Q, it discussed its sales growth, earnings per diluted share, and improved operating margin.  Dentsply Intl. again failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth includes global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

107.    The Q3 2014 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have

been no changes in the Company's internal controls over financial reporting that occurred during the most recent quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

108.   On October 29, 2014, Dentsply Intl. also filed a Form 8-K with the SEC attaching a press release of the same date which discussed its Q3 2014 results.  In this press release, Wise was silent on the antitrust scheme discussed herein and instead stated, "We are pleased to deliver improved sales and earnings performance in the third quarter while operating in global market conditions that are generally stable. Our results reflect the significant opportunity we have at Dentsply to create value by leveraging our global cost structure and redirecting resources to the areas of greatest growth potential."

109.   On October 29, 2014, Dentsply Intl. also participated in a conference call with analysts and investors to discuss its 2014 third quarter financial results.  During the call Clark stated that quarterly operating margins were 18.7%, and that "[w]e continue to be pleased with our operating margin improvement [and] … are solidly on track towards our objective of reaching a 20% adjusted operating margin rate in 2017 and believe our margin improvement strategies are gaining traction."

110.   On February 20, 2015, Dentsply Intl. filed its Form 10-K with the SEC for the fiscal year ended December 31, 2014 (the "2014 10-K").  In this 2014 10-K, it discussed its increased sales, improved operating margins, and increased operating cash flow.  Dentsply Intl. failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth includes global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

111.   In this 2014 10-K, Dentsply Intl. also made materially false and misleading statements concerning the "highly competitive" U.S. dental market and how it was able to sustain or grow its market share, stating in relevant part:

> The Company conducts its operations, both domestic and foreign, under highly competitive market conditions.  Competition in the dental and medical products industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance by clinicians, technicians and patients. Dentsply believes that its principal strengths include its well-established brand names, its reputation for high quality and innovative products, its leadership in product development and manufacturing, its global sales force, the breadth of its product line and distribution network, its commitment to customer satisfaction and support of the Company's products by dental and medical professionals.

112.   Preceding the release of its 2014 10-K, on February 18, 2015, Dentsply Intl. participated in a conference call with analysts and investors to discuss its 2014 fourth quarter and full year financial results.  During the call:

   a.  Clark stated that the quarterly operating margins were 17.7%.  Clark then added that quarterly adjusted gross profit was 57.4% of sales, and that this percentage "reflect[ed] the favorable impact of price, mix, FX, and some of our recent operational improvement efforts, partially offset by lower absorption as we took out inventory in the period."

   b.  Wise stated the Company had "shown a pretty consistent trend of improved operating margins throughout the year" which was "a good sign for the impact of the programs we've instituted."  Wise later added "we entered 2014 focused on new product launches and growth but also on improving our efficiency in terms of operating margins, asset churns and cash flow as priorities […]. We made some good progress on these priorities in 2014, significantly increasing our

operating margins, our asset churns and our cash flow generation."

113.   On May 6, 2015, Dentsply Intl. filed its Form 10-Q for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). In this Q1 2015 10-Q, it discussed its sales, earnings per diluted share, and improved operating margin. Dentsply Intl. again failed to disclose that its performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth includes global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

114.   The Q1 2015 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during quarter ended March 31, 2015 that have materially affected, or are likely to materially affect, its internal control over financial reporting."

115.   On May 6, 2015, Dentsply Intl. participated in a conference call with analysts and investors to discuss its 2015 first quarter financial results. During the call Clark stated that quarterly adjusted operating margins were 18.7%, and that "[o]ur performance this quarter reflects the gross margin and SG&A impacts that I just described, as well as the impact of our operating margin improvement initiatives."

116.   On July 30, 2015, Dentsply Intl. filed its Form 10-Q for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). In this Q2 2015 10-Q, it discussed its increased sales, improved gross profit rate, and operating margin. Dentsply Intl. again failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth includes global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

117. The Q2 2015 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during quarter ended June 30, 2015 that have materially affected, or are likely to materially affect, its internal control over financial reporting."

118. On July 31, 2015, Dentsply Intl. participated in a conference call with analysts and investors to discuss its 2015 second quarter financial results.  During the call:

    a. Mosch stated that "[n]ew products launched in the latter part of 2014 and Q1 of 2015 in both the restorative and preventative areas are driving growth coupled with procedural selling efforts in the areas of Class II and post endodontic restorations.  In addition, US retail growth appears to be stable and growing well versus prior year."

    b. Wise stated, "we've been focused on how to become more efficient internally while channeling funds back into initiatives that can drive sustainable growth above the market, irrespective of the market conditions."  Defendant Wise further stated during the call that "Based on our earnings to date, the market developments as we see them and the outlook for the net benefits coming from the efficiency program, we are adjusting our guidance range from the $2.50 to the $2.60 that we established at the beginning of the year to a new range of adjusted

earnings per share for the year of $2.54 to $2.62. This reflects our confidence in our performance so far and the initiatives we have underway and also the currency drag that we expect based on the rates today."

    c.   Clark reported that the quarterly adjusted operating margins were 21.1%, and that this was "our strongest quarterly operating margin performance in 28 quarters. This represents the impact of significant internal focus on this measure via our global efficiency improvement initiative, as well as positive benefits from price, mix and currency."

119.   On October 30, 2015, Dentsply Intl. filed its Form 10-Q for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). In this Q3 2015 10-Q, it discussed its improved sales growth, improved gross profit rate, and improved operating cash flow. Dentsply Intl. again failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth includes global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

120.   The Q3 2015 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during quarter ended September 30, 2015 that have materially affected, or are likely to materially affect, its internal control over financial reporting."

121.   Preceding the release of its Q3 2015 10-Q, Dentsply Intl. participated in a conference call with analysts and investors to discuss its 2015 third quarter financial

results.  During the call Clark stated that the Company's quarterly operating margins were 20.9%, and that these margins "represent[ed] the accelerating impact of our global efficiency improvement initiative."  Clark also stated that "As I mentioned, we continue to be very pleased with the progress of our global efficiency program as the P&L impact from our aggregate efforts continues to accelerate."

### Sirona Pre-Dentsply/Sirona Merger
### Materially False and Misleading Statements

122.    On November 21, 2014, Sirona filed its Form 10-K with the SEC for the fiscal year ended September 30, 2014 (the "Sirona 2014 10-K").  In the Sirona 2014 10-K, it touted its revenue growth, increased operating income, and increased net income.  Sirona failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and/or the true impact of the Sirona/Patterson Agreements and instead stated in relevant part:

> For the fiscal year ended September 30, 2014, we reported revenue growth of 6.3% […].  We continue to experience solid growth in demand for our CAD/CAM and Imaging products.  Instruments was the strongest growing segment this year benefiting from our new state-of-the-art manufacturing facility in Bensheim, Germany, as well as strong demand for our hygiene product line […].

> \* \* \*

> There can be no assurance that Patterson and Henry Schein will purchase any specified minimum quantity of products from us or that they will continue to purchase any products at all.

123.    Throughout the Relevant Period, Sirona failed to disclose the true cause of its increased receivables (*i.e.*, the minimum purchase requirements contained in the Sirona/Patterson Agreements).  Instead, in its quarterly reports filed with the SEC on Form 10-Q on February 6, 2015 (for the quarter ending December 31, 2014), May 8, 2015 (for the quarter ending March 31, 2015), and August 7, 2015 (for the quarter

ending June 30, 2015), Sirona stated in substantially similar form in each report:

> The higher increase in receivables in the current-year period resulted primarily from the purchasing pattern of Patterson, our largest distributor, with low shipments in August and September 2014.

124.    On November 20, 2015, Sirona filed its Form 10-K with the SEC for the fiscal year ended September 30, 2015 (the "Sirona 2015 10-K").  In this 2015 10-K, it discussed its revenue performance, increased operating income, and increased net income.  Sirona failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and/or the true impact of the Sirona/Patterson Agreements and instead stated in relevant part:

> We continued to see growing demand for products across all segments.

* * *

> Revenues benefited primarily from strong demand for our CAD/CAM Systems and Imaging products. Sales in the latter part of the fiscal year showed signs of a promising future growth in the U.S. for our Treatment Center segment.

* * *

> Our Treatment Center segment continued to witness steady increase in demand across all product lines.  Segment growth was especially strong in Europe.  Sales of our treatment centers in the U.S gained traction in the latter part of the fiscal year with market launches via our expanded distribution agreement with Patterson.

* * *

> There can be no assurance that Patterson and Henry Schein will purchase any specified minimum quantity of products from us or that they will continue to purchase any products at all.

## Dentsply/Sirona Merger Related Material Misstatements and Omissions

125.   On September 15, 2015, Dentsply Intl. and Sirona issued a joint press release announcing that the ". . . Boards of Directors of both companies have unanimously approved a definitive merger agreement under which the companies will combine in an all-stock merger of equals."   Under the terms of the Dentsply/Sirona merger, Sirona shareholders would receive 1.8142 shares of Dentsply Intl. common stock in exchange for each share of Sirona common stock they held.  At the completion of this transaction, Dentsply Intl. shareholders will own 58% and Sirona shareholders will own 42% of the combined company.  This press release also identified the post-merger Dentsply leadership team and Board of Directors makeup, stating:

> Upon closing of the transaction, Jeffrey T. Slovin, President and Chief Executive Officer of Sirona, will serve as Chief Executive Officer of the combined company and will be a member of the Board of Directors.  Bret. W. Wise, Chairman and Chief Executive Officer of Dentsply, will serve as Executive Chairman of the combined company. The Executive Chairman will work in collaboration with the CEO to execute the corporate strategy and to integrate the companies and cultures. From Dentsply, Christopher T. Clark and James G. Mosch will serve as President and Chief Operating Officer, Technologies and President and Chief Operating Officer, Dental and Healthcare Consumables, respectively. From Sirona, Ulrich Michel will serve as Executive Vice President and Chief Financial Officer.  The Board of Directors will consist of 11 members, six of which (including Mr. Wise) are current Dentsply directors and five of which (including Mr. Slovin) are current Sirona directors. Additional senior leadership positions at the combined company will be named at a later date, consisting of representatives from both companies.

126.   On October 29, 2015, Dentsply Defendants filed a combined registration statement on Form S-4, prospectus ("Prospectus") and joint proxy statement ("Proxy") (together, the "Registration Statement") with the SEC.   On December 4, 2015, Dentsply filed a Form S-4/A with the SEC and relating to the proposed merger.  On December 7, 2015, the SEC declared the Registration Statement effective.

127.   On December 8, 2015, Dentsply filed a Form 424B3 Joint Proxy Statement/Prospectus seeking shareholder approval of the Dentsply/Sirona merger and with a Special Meeting of Stockholders scheduled for January 11, 2016.

128.   The Registration Statement incorporated by reference certain identified Dentsply Intl. SEC filings, including its (1) annual report on Form 10-K for the fiscal year ended December 31, 2014; (2) quarterly reports on Forms 10-Q for the quarterly periods ended March 31, 2015, June 30, 2015 and September 30, 2015; and (3) current reports on Forms 8-K filed on February 18, 2015, May 6, 2015, July 30, 2015, September 15, 2015, September 16, 2015, October 28, 2015, and October 29, 2015.

129.   The Registration Statement also incorporated by reference identified Sirona SEC filings, including its (i) annual reports on Forms 10-K for the fiscal years ended September 30, 2014 and September 30, 2015, and any amendments thereto; (ii) quarterly reports on Forms 10-Q for the periods ended December 31, 2014, March 31, 2015 and June 30, 2015; and (iii) current reports on Forms 8-K filed September 15, 2015, September 16, 2015 and November 23, 2015.

130.   Because the Registration Statement incorporated by reference each of the above identified documents filed with the SEC by Dentsply and its predecessors, each of the material misstatements and omissions in those documents as identified herein were also incorporated by reference and made a part of the Registration Statement.

131.   The Registration Statement described the businesses of Dentsply Intl. and Sirona without disclosing that their growth and success were directly benefitting from the Distributors antitrust scheme as discussed herein.  For example, the Registration Statement described Sirona as " . . . uniquely positioned to benefit from several trends in the global dental industry, such as technological innovation, the shift to digital imaging, favorable demographic trends, and growing patient focus on dental health and cosmetic appearance."  This statement was materially false and misleading

because it failed to disclose the Distributor antitrust scheme and further failed to disclose the impact of the excessive sales to Patterson through the Sirona/Patterson Agreements, which had placed Sirona's financial results and condition in jeopardy.

132.    The impact of the excessive sales to Patterson through the Sirona/Patterson Agreements was discussed in the Shareholders Litigation Action (at ¶¶ 46-48):

   a.   Patterson continued to purchase CEREC systems from Sirona at an accelerating rate in the years immediately preceding the Acquisition in order to meet its minimum purchase requirements under the [Sirona/Patterson] Agreements, which in turn was necessary in order for Patterson to maintain its exclusive distributor status.  However, Patterson was simply unable to re-sell to end users all of the increasing amounts of product inventory that it was buying from Sirona.

   b.   Indeed, by the time that the Registration Statement became effective in December 2015, Patterson's purchases had so outpaced its re-sales to actual end-users that Patterson's inventory of CEREC systems had ballooned to massive levels.  In other words, by late 2015, the channel for selling CEREC systems was "stuffed" – as Sirona's management was well aware based on the regular reports it received from Patterson.

   c.   Moreover, Patterson was open regarding its inventory problems, given its contractual reporting obligations to Sirona.  In fact, industry participants were aware of Patterson's inventory levels, given the close-knit relationship between sales representatives of dental suppliers (such as Sirona and Dentsply Intl.) and representatives of the Distributors (such as Patterson). Sirona even tried to come up with discounted product bundles to facilitate Patterson's sale of excess

inventory.  As a result, Patterson's inventory problems were common knowledge in the industry.

133.   Instead, the Registration Statement promoted the Dentsply/Sirona merger by claiming the combined company would ". . . capitalize on key industry trends . . ." and will have greater revenue "predictability".

134.   On January 11, 2016, Dentsply Intl. filed a Form 8-K with the SEC and published a press release announcing the "[s]hareholders of each company overwhelmingly approved all proposals necessary to complete the merger of equals transaction."  On February 29, 2016, completion of the Dentsply/Sirona merger was announced.

**Post-Dentsply/Sirona Merger Materially False and Misleading Statements**

135.   On February 12, 2016, Dentsply Intl. filed its Form 10-K with the SEC for the fiscal year ended December 31, 2015 (the "2015 10-K").  In this 2015 10-K, it discussed its sales, earnings, and operating margins.  Dentsply Intl. claimed that its improved adjusted operating margin ". . . was 20.2%, an improvement of 180 basis points over the prior year reflecting operating improvements, net of reinvestment, associated with the Company's global efficiency initiative."

136.   Dentsply Intl. failed to disclose that its performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth includes macroeconomic factors, global dental market growth, innovation and new products launched by the Company, and continued investments in sales and marketing resources, including clinical education.

137.   In this 2015 10-K, Dentsply Intl. also made materially false and misleading statements concerning the "highly competitive" U.S. dental market and how it was able to sustain or grow its market share, stating in relevant part:

The Company conducts its operations, both domestic and foreign, under highly competitive market conditions. Competition in the dental and medical products industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance by clinicians, technicians and patients. Dentsply believes that its principal strengths include its well-established brand names, its reputation for high quality and innovative products, its leadership in product development and manufacturing, its global sales force, the breadth of its product line and distribution network, its commitment to customer satisfaction and support of the Company's products by dental and medical professionals.

138. On February 12, 2016, Dentsply Intl. also participated in a conference call with analysts and investors to discuss its 2015 fourth quarter and full year financial results. As recounted in the Securities Class Action, during the call:

 a. Clark [] reported that the quarterly operating margins were 19.9% and the operating margins for the year were 20.2%, and that these margins "reflect[ed] the full-year impact of our global efficiency program, as well as the currency benefit moving through our cash flow hedges."

 b. Clark also stated, "we are pleased with the operating performance of the business, particularly the traction from the efficiency program and now our ability to translate that into growth investments in addition to operating margin improvements," and that the Company's fourth quarter improvement "reflects favorable impacts of our global operational improvement efforts, currency and price."

139. On May 6, 2016, Dentsply filed its Form 10-Q for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). This was the first quarterly report filed as a combined company. In this Q1 2016 10-Q, it discussed its increased sales and improved earnings growth per diluted share. Dentsply again failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein

and the true impact of the Sirona/Patterson Agreements and instead stated in relevant part:

> The primary drivers of internal growth include macroeconomic factors, global dental market growth, innovation and new product launches by the Company, as well as continued investments in sales and marketing resources, including clinical education.

140.   In the Q1 2016 10-Q, Dentsply represented that total goodwill as of March 31, 2016 was $5.836 billion.

141.   The Q1 2016 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective.  Regarding its internal controls, in its Q1 2016 10-Q, Dentsply stated:

> Except for the merger with Sirona, there have been no changes in the Company's internal controls over financial reporting that occurred during the quarter ended March 31, 2016, that have materially affected, or are likely to materially affect, its internal control over financial reporting. Management has documented and is in the process of testing Sirona's internal controls over financial reporting, and will incorporate Sirona into its annual assessment of internal control over financial reporting for the Company's year ending December 31, 2016.

142.   On May 6, 2016, Dentsply also participated in a conference call with analysts and investors to discuss its 2016 first quarter financial results:

> a.  Slovin stated that "innovation and best-in-class customer service will be two key pillars of our new organization."  On the same call, Slovin added that the Company had "been working closely with our distributors to develop plans that create growth opportunities for ourselves and our partners."
>
> b.  Michel reported that quarterly adjusted operating margins were

22.2%, and that these margins "benefited from the positive impacts of the global efficiency program and the consolidation of Sirona."

143.    On August 5, 2016, Dentsply filed its Form 10-Q for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"). In this Q2 2016 10-Q, it discussed its increased sales and improved earnings growth per diluted share. Dentsply again failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and the true impact of the Sirona/Patterson Agreements and instead stated in relevant part:

> The primary drivers of internal growth include macroeconomic factors, global dental market growth, innovation and new product launches by the Company, as well as continued investments in sales and marketing resources, including clinical education.

144.    In the Q2 2016 10-Q, Dentsply represented that total goodwill as of June 30, 2016 was $5.795 billion.

145.    The Q2 2016 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective. Regarding its internal controls, in its Q1 2016 10-Q, Dentsply stated:

> There have been no changes in the Company's internal controls over financial reporting that occurred during the quarter ended June 30, 2016, that have materially affected, or are likely to materially affect, its internal control over financial reporting. In connection with the merger with Sirona during the quarter ended March 31, 2016, management has documented and is in the process of testing Sirona's internal controls over financial reporting, and will incorporate Sirona into its annual assessment of internal control over financial reporting for the Company's year ending December 31, 2016.

146.    On August 5, 2016, Dentsply also participated in a conference call with

analysts and investors to discuss its 2016 second quarter financial results:

    a. Slovin stated that "we are announcing a number of new products which I think is always critical to driving growth . . . . These new products along with others will help us grow and gain market share."

    b. Michel reported that the Company's quarterly gross profit margins were 60.2%, and that these margins "benefit[ed] from [the Company's] global efficiency program which largely offset negative foreign currency impacts."

    c. Michel also reported that the quarterly operating margins were 23.1%, and that these margins "benefited from the positive impacts of the global efficiency program and the consolidation of SIRONA."

147. On November 4, 2016, Dentsply filed its Form 10-Q for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"). In this Q3 2016 10-Q, it discussed its increased sales and earnings per diluted share. Dentsply again failed to disclose that its improved performance was due, at least in part, to the antitrust scheme discussed herein and the true impact of the Sirona/Patterson Agreements and instead stated in relevant part:

> The primary drivers of internal growth include macroeconomic factors, global dental market growth, innovation and new product launches by the Company, as well as continued investments in sales and marketing resources, including clinical education.

148. In the Q3 2016 10-Q, Dentsply represented that total goodwill as of September 30, 2016 was $6.057 billion.

149. The Q3 2016 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective. Regarding its internal controls, in

its Q3 2016 10-Q Dentsply stated:

> There have been no changes in the Company's internal controls over financial reporting that occurred during the quarter ended September 30, 2016, that have materially affected, or are likely to materially affect, its internal control over financial reporting. In connection with the merger with Sirona during the quarter ended March 31, 2016, management has documented and is in the process of testing Sirona's internal controls over financial reporting, and will incorporate Sirona into its annual assessment of internal control over financial reporting for the Company's year ending December 31, 2016.

150.   On November 4, 2016, Dentsply also participated in a conference call with analysts and investors to discuss its 2016 third quarter financial results:

    a.   Slovin stated that Dentsply Sirona's "growth comes from our tremendous brand and product portfolio, our sales and service infrastructure, our clinical education, and our ability to launch new products," adding that "[o]ur balance sheet remains strong."

    b.   Michel reported that quarterly adjusted operating margins were 20.8%, and that these margins "benefited from the positive impacts of the global efficiency program and the consolidation of SIRONA."

151.   On November 22, 2016, Patterson announced that it elected not to extend exclusivity with Sirona for its entire portfolio beyond September 2017.[5]

152.   On March 1, 2017, Dentsply filed its Form 10-K with the SEC for the fiscal year ended December 31, 2016 (the "2016 10-K"). In this 2016 10-K, the Company discussed its increased sales, increased net income, and increased earnings per diluted share. Dentsply failed to disclose that its improved performance was due,

---

[5]   *See* https://thefly.com/landingPageNews.php?id=2466948&headline=PDCO;XRAY-Patterson-wont-extend-exclusive-portion-of-Sirona-relationship-after-Sep-

at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth include macroeconomic factors, global dental market growth, innovation and new product launches by the Company, as well as continued investments in sales and marketing resources, including clinical education.

153.   In this 2016 10-K, Dentsply also made materially false and misleading statements concerning the "highly competitive" U.S. dental market and how it was able to sustain or grow its market share, stating in relevant part:

> The Company conducts its operations, both domestic and foreign, under highly competitive market conditions. Competition in the dental and healthcare consumable products and dental technology product industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance by clinicians, technicians and patients. Dentsply Sirona believes that its principal strengths include its well-established brand names, its reputation for high quality and innovative products, its leadership in product development and manufacturing, its global sales force, the breadth of its product line and distribution network, its commitment to customer satisfaction and support of the Company's products by dental and medical professionals.

154.   Regarding Patterson's election to not to extend exclusivity, Dentsply stated in relevant part:

> During the fourth quarter of 2016, upon the announcement that the exclusive provisions of the agreement would expire by its terms, Patterson began to reduce inventories in both the United States and Canada, which negatively impacted the Company's reported sales in the fourth quarter.  The reduction of inventory by Patterson is expected to continue in 2017 as the Company and Patterson move to a non-exclusive arrangement. The Company is evaluating its options for additional channels of distribution for subject products commencing as early as October 2017, although no firm decisions have been reached as of the date of this filing.  As a result of the above, the Company's sales will likely fluctuate in 2017 on a quarter by quarter basis, as Patterson reduces

inventory in some periods and as other market channels are brought on line in other periods.

155.   In the 2016 10-K, Dentsply stated that the "... performance of the Company's 2016 annual impairment test did not result in any impairment of the Company's goodwill" and represented that total goodwill as of December 31, 2016 was $5.952 billion.

156.   Preceding the release of its 2016 10-K, on February 17, 2017, Dentsply participated in a conference call with analysts and investors to discuss its 2016 fourth quarter and full year financial results:

     a.   Slovin stated that in 2016, the Company's revenue "growth came in the face of challenging market conditions," including the purported fact that the "US dental markets slowed down unexpectedly from summer until late in the year."  According to Slovin, the Company's "diversification in both geography and product portfolio is proving to be a competitive advantage.  Coming together at the right time enabled us to accelerate growth through early revenue synergies."

     b.   Michel reported that adjusted annual operating margins were 21%, and that these margins "benefited from the positive impacts of cost reduction programs and the consolidation of Sirona."

     c.   Regarding Patterson's election to not to extend exclusivity, Slovin stated that Dentsply "share[d] the view with Patterson that broadening our go-to-market strategy in North America will accelerate the adoption of our technologies" and that the "change in our go-to-market strategy will begin reaping benefits in growth and accelerating market penetration later this year and into 2018 and beyond."

157.   On May 10, 2017, Dentsply filed its Form 10-Q for the quarter ended

March 31, 2017 (the "Q1 2017 10-Q").  In this Q1 2017 10-Q, it discussed the status of its sales, the impact of distributor inventory levels, and earnings growth per diluted share.  Dentsply again failed to disclose that its performance was due, at least in part, to the antitrust scheme discussed herein and instead stated in relevant part:

> The primary drivers of internal growth include macroeconomic factors, global dental market growth, innovation and new product launches by the Company, as well as continued investments in sales and marketing resources, including clinical education.  Management believes that the Company's ability to execute its strategies has allowed it to grow faster than the underlying dental market.

> * * *

> The Company has two exclusive distribution agreements with Patterson Companies, Inc. ("Patterson") for the marketing and sales of certain legacy Sirona products and equipment in the United States and Canada. In order to maintain exclusivity, certain purchase targets had to be achieved.  In the fourth quarter 2016, the decision not to extend the exclusivity beyond September 2017 was announced.  The Company's relationship with Patterson remains strong as the Company recently entered into a new three-year agreement with Patterson to continue to distribute the Company's equipment lines in the United States on a non-exclusive basis.  Year-over-year, changes in Patterson inventory negatively impacted the Company's reported sales in the first quarter of 2017 by approximately $35 million. Inventory held by Patterson increased during the first quarter of 2016 by approximately $26 million, aligned with their typical purchasing ahead of their year-end and in an effort to meet minimum purchase targets required in order to maintain exclusivity.  Inventory held by Patterson decreased during the first quarter of 2017 by approximately $9 million.  The Company expects Patterson to continue to reduce their inventory of the Company's equipment by an additional $50 to $60 million in the aggregate in the second and third quarters of 2017.

158.   In the Q1 2017 10-Q, Dentsply represented that total goodwill as of March 31, 2017 was $5.958 billion.

159.   The Q1 201710-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during the quarter ended March 31, 2017, that have materially affected, or are likely to materially affect, its internal control over financial reporting."

160.   Preceding the release of its Q1 2017 10-Q, on May 9, 2017, Dentsply participated in a conference call with analysts and investors to discuss its 2017 first quarter financial results.   As recounted in the Securities Class Action, during the call:

      a.  Slovin touted Dentsply Sirona's "unique and important relationship with Patterson," telling investors that "we have confidence in our long-standing relationship with Patterson."   In fact, in a direct response to analysts questions about the "margin profile of your business through Schein or Patterson," Slovin refused to "get into the contracts that's been agreed to by both parties" but stated that "we are confident that this – the way we've set up our structure benefits both Henry Schein and Patterson."

161.   The above statements by Dentsply and/or its predecessors   were materially false and misleading when made because (i) they misrepresented the state of competition in the industry for Dentsply and its predecessors; and/or (ii) failed to disclose the effect of the Distributors' ongoing anticompetitive scheme; and/or (iii) failed to disclose the sources and causes of their financial performance; and/or (iv) failed to disclose the true impact of the Patterson/Sirona agreements; and (v) as a result, Dentsply future sales and the true value of Dentsply goodwill would be dramatically impacted.

## THE TRUTH BEGINS TO EMERGE

162.    On August 9, 2017, Dentsply filed its Form 10-Q for the quarter ended June 30, 2017 (the "Q2 2017 10-Q").  On this same date, Dentsply filed a Form 8-K with the SEC and published a press release discussing its second quarter financial results.

163.    Dentsply admitted that its financial results fell far short of analyst expectations and provided updated guidance of adjusted EPS in the range of $2.65 to $2.75 which was dramatically lower than its previously provided guidance of adjusted EPS in the range of $2.80 to $2.90 per diluted share (as stated in its press release accompanying Dentsply's Q1 2017 10-Q).  In the press release, Slovin stated:

> Our results were impacted by a number of factors, the largest of which are headwinds associated with Patterson reducing its inventory in North America and the transition of North American distribution.  Year to date, operational execution has not met our expectations.  Our lower outlook reflects the underperformance in the first half of the year and some of those challenges persisting in the back half of the year.

164.    In the Q2 2017 10-Q, Dentsply disclosed that ". . . the goodwill associated with the CAD/CAM, Imaging and Treatment Center equipment reporting units were impaired.  As a result, the Company recorded a goodwill impairment charge of $1,092.9 million" and recorded an additional impairment charge of $79.8 million relating to the ". . . impaired indefinite-lived intangible assets are tradenames and trademarks related to the CAD/CAM and Imaging equipment reporting units."

165.    Additionally, the Q2 2017 10-Q disclosed that the SEC had opened an investigation into Dentsply's accounting and disclosures, particularly relating to transactions with a "significant distributor of the Company", stating:

> The SEC's Division of Enforcement has asked the Company to provide documents and information concerning the Company's accounting and

disclosures, including its accounting and disclosures relating to transactions with a significant distributor of the Company. The Company is cooperating with the SEC's investigation. The Company is unable to predict the ultimate outcome of this matter, or whether it will have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

166.   Notwithstanding the foregoing, the Q2 2017 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during the quarter ended June 30, 2017, that have materially affected, or are likely to materially affect, its internal control over financial reporting."

167.   On this news, the price of Dentsply shares dropped approximately 8.4%, declining from $61.41 per share on August 8, 2017 to close at $56.23 per share on August 9, 2017.

168.   Notwithstanding the partial truths disclosed by Dentsply in its Q2 2017 10-Q, it continued to mislead the investing public regarding its business drivers stating in relevant part:

> The primary drivers of internal growth include macroeconomic factors, global dental market growth, innovation and new product launches by the Company, as well as continued investments in sales and marketing resources, including clinical education.

169.   On October 2, 2017, Dentsply filed a Form 8-K with the SEC and published a press release announcing the resignation of Slovin (its Chief Executive Officer and Director), Wise (its Executive Chairman), and Clark (its President and Chief Operating Officer).  In its press release, Dentsply stated that each of these

resignations was ". . . *not related to any issues or disagreements regarding the Company's financial disclosures, accounting policies and practices*."

170.   On this news, the price of Dentsply shares dropped approximately 5.8%, declining from $59.81 per share on September 29, 2017 to close at $56.33 per share on October 2, 2017.

171.   On October 16, 2017, Dentsply filed a Form 8-K with the SEC announcing that on October 10, 2017 Jonathan I. Friedman, the Senior Vice President, Secretary and General Counsel of Dentsply tendered his resignation from employment with the Company, which resignation was accepted effective October 11, 2017.   Dentsply further stated that it ". . . *will provide Mr. Friedman with the benefits available under his employment agreement in the case of a termination by the Company without cause*."

172.   On November 3, 2017, Dentsply filed a Form 8-K with the SEC announcing the resignation of Michel (its Executive Vice President and Chief Financial Officer) effective November 10, 2017.   Dentsply further stated that "[*t*]*he Company and Mr. Michel agreed that his employment with the Company will continue through December 31, 2017, at which time he will be eligible for the benefits available under his employment agreement with the Company in the case of a termination by the Company without cause*."

173.   On November 9, 2017, Dentsply filed its Form 10-Q for the quarter ended September 30, 2017 (the "Q3 2017 10-Q").   In this Q3 2017 10-Q, it discussed its increased sales and earnings growth per diluted share.   In its Q3 2017 10-Q, Dentsply continued to mislead the investing public regarding its business drivers stating in relevant part:

> The primary drivers of internal growth include macroeconomic factors, global dental market growth, innovation and new product launches by the

Company, as well as continued investments in sales and marketing resources, including clinical education.

174.   The Q3 2017 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during the quarter ended September 30, 2017, that have materially affected, or are likely to materially affect, its internal control over financial reporting."

175.   Preceding the release of its Q3 2017 10-Q, on November 3, 2017 Dentsply participated in a conference call with analysts and investors to discuss its 2017 first quarter financial results.   During the call, Michel reported that internal growth increased 2.4% and that "[o]ur growth was driven by strength in the U.S., which grew 7.1%," explaining that the Company was "beginning to see the benefit of our expanded distribution agreement in equipment."

176.   On March 15, 2018, Dentsply filed its Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 10-K").   In this 2017 10-K, it discussed its increased sales, net income, and other relevant business and financial matters.   In its 2017 10-K, Dentsply continued to mislead the investing public regarding its business drivers stating in relevant part:

> The primary drivers of internal growth include macroeconomic factors, global dental market growth, innovation and new product launches by the Company, as well as continued investments in sales and marketing resources, including clinical education.

177.   In this 2017 10-K, Dentsply also made materially false and misleading statements concerning the "highly competitive" U.S. dental market and how it was able to sustain or grow its market share, stating in relevant part:

The Company conducts its operations, both domestic and foreign, under highly competitive market conditions. Competition in the dental and healthcare consumable products and dental technology product industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance by clinicians, technicians and patients. Dentsply Sirona believes that its principal strengths include its well-established brand names, its reputation for high quality and innovative products, its leadership in product development and manufacturing, its global sales force, the breadth of its product line and distribution network, its commitment to customer satisfaction and support of the Company's products by dental and medical professionals.

178. Not withstanding the foregoing, in its 2017 10-K, Dentsply also identified *additional* goodwill impairment charges of $558 million and $266.9 million. Regarding these additional goodwill impairments, Dentsply stated:

In preparing the financial statements for the year ended December 31, 2017, the Company identified an impairment triggering event related to the CAD/CAM, Imaging and Treatment Center equipment reporting units. Forecasted revenues and operating margins for these reporting units were impacted by continued unfavorable developments in the marketplace which included an increase in competition. These developments resulted in significantly lower sales to end-users than expected in the fourth quarter of 2017 in the North America and Rest of World regions as well as declines in expected gross profit rates which included the unfavorable impacts from changes in the foreign exchange rates. The impacts from foreign exchange rate changes were primarily driven by the strengthening of the euro versus the U.S. dollar as a result of the higher euro denominated costs and net assets associated with these reporting units as compared to the lower amount of euro denominated sales. While the Company considered unfavorable market developments and foreign exchange rate changes, in its April 30, 2017 assessment, the impact of these developments were at levels beyond those anticipated by the Company despite moving away from a non-exclusive distribution channel in the United States and the execution of new distribution agreements with Patterson Companies, Inc. and Henry Schein, Inc. in May and June of 2017. In addition to the unfavorable market and foreign

exchange rate developments, the income tax rate forecast used in the annual goodwill test was unfavorably impacted by the recent tax legislation in the U.S. and other foreign jurisdictions. As a result the Company tested these reporting units for impairment in preparation of the financial statements for the year ended December 31, 2017 and determined that the goodwill associated with the CAD/CAM, Imaging and Treatment Center equipment reporting units, all within the Technologies & Equipment segment, was impaired. The impairment was the result of a change in forecasted sales and gross profit as well as changes in foreign exchange rates and the income tax rate. As a result, the Company recorded a goodwill charge of $558.0 million for the three months ended December 31, 2017. The combination of impairment charges for the second and fourth quarters of 2017 resulted in a total goodwill impairment charge of $1,650.9 million for the year ended December 31, 2017.

In preparing the financial statements for the year ended December 31, 2017, the Company, as result of the triggering event, tested the indefinite-lived intangible assets related to these reporting units for impairment. As a result, the Company identified that certain tradenames and trademarks related to the CAD/CAM, Imaging and Treatment Center equipment reporting units, all within the Technologies & Equipment segment, were impaired. The Company recorded an impairment charge of $266.9 million for the three months ended December 31, 2017 which was recorded in Restructuring and other cost on the Consolidated Statements of Operations. The combination of impairment charges for the second and fourth quarters of 2017 resulted in a total impairment charge for the year ended December 31, 2017 of $346.7 million related to indefinite-lived assets.

179.    On this news, Dentsply's stock price exhibited a continuing fall from its opening share price of $57.15 per share on March 15, 2018 to close at $49.95 per share on March 28, 2018.

180.    Preceding the release of its 2017 10-K, on March 2, 2018, Dentsply participated in a conference call with analysts and investors to discuss its 2017 first quarter financial results:

    a. Casey stated that the Company's "leadership position in technology and equipment, such as CAD/CAM and imaging, is another major strength and an important foundation for future growth."

    b. Alexos stated that the Company's improvement in reported adjusted margin rate versus the prior year was "a function of stronger product and regional mix and higher volumes creating SG&A leverage."

181.   On May 7, 2018, Dentsply filed its Form 10-Q for the quarter ended March 31, 2018 (the "Q1 2018 10-Q").   In this Q1 2018 10-Q, it discussed its increased sales, improved earnings per diluted share, and other relevant business and financial matters.  In its Q1 2018 10-Q, Dentsply continued to mislead the investing public regarding its business drivers stating in relevant part:

> The primary drivers of internal growth include macroeconomic factors, global dental market growth, innovation and new product launches by the Company, as well as continued investments in sales and marketing resources, including clinical education.

182.   The Q1 2018 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during the quarter ended March 31, 2018, that have materially affected, or are likely to materially affect, its internal control over financial reporting."

183.   Preceding the filing of its Q1 2017 10-Q, on May 6, 2017, Dentsply published a press release disclosing that total sales growth declined 1.1% year over year lead by a 7.4% decline in the U.S. year over year.   Based on Dentsply's performance it announced it was again lowering its guidance of adjusted EPS in the range of $2.55 to $2.65.   In the press release, Casey stated:

Despite a solid performance in many businesses and regions, overall results for the quarter were disappointing due headwinds in the U.S. Technologies & Equipment business . . . .  Our revised guidance reflects our expectations of continued headwinds in that important business and more importantly the steps we are taking to return the company to growth. Our priority for the remainder of 2018 is to invest in comprehensive strategies designed to help accelerate demand in this market. They include increased marketing support, additional sales representatives and other efforts designed to create growth both short term and long term. Additionally, we are opening a state-of-the-art training facility in Charlotte that underscores our commitment to clinical education. It is our belief that these investments are essential to support our total portfolio, including the Technologies & Equipment business, our robust R&D pipeline and important new technology platforms like OraMetrix. We remain very much committed and on track with our cost savings programs. By focusing on these critical priorities we expect to drive significant and sustainable shareholder value.

184.   On this news, Dentsply's stock price fell $5.52, or 11%, from $49.99 per share on May 4, 2018 to close at $44.47 per share on May 8, 2018.

185.   On August 7, 2018, Dentsply filed its Form 10-Q for the quarter ended June 30, 2018 (the "Q2 2018 10-Q").  On this same date, Dentsply filed a Form 8-K with the SEC and published a press release discussing its second quarter financial results.

186.   Dentsply again admitted that its financial results fell far short of analyst expectations and provided updated guidance of adjusted EPS in the range of $2.00 to $2.15.  In the press release, Casey stated:

We are clearly not satisfied with our performance. Our global management team is in the middle of an extensive review of the business and is putting together a comprehensive restructuring program. This restructuring plan is focused on accelerating growth, improving our margin through aggressive cost containment programs and simplifying the organization. We will begin to execute against this plan immediately

and expect it to deliver sustainable, consistent earnings growth and enhanced forecasting capability beginning in early 2019.

187.   Additionally, Dentsply announced another goodwill impairment charge of $1,265 million.  In its press release, Dentsply discussed this goodwill impairment as follows:

> During the quarter ended June 30, 2018, the Company recorded a goodwill and intangible impairment charge of $1,265 million. Of this charge, $1,196 million was in the Technologies and Equipment segment. The Technology and Equipment Segment was negatively affected by the continued transition of the Company's distribution relationships in the U.S., lower anticipated revenue and margin in our Imaging and CAD CAM businesses, and an elevated level of expected dealer inventory destocking in the U.S. in 2018.  In addition, an increase in both the risk factor and discount rate was a significant factor in driving the Technology and Equipment goodwill and intangible impairment. The Consumable Segment had a $69 million impairment, reflecting lower than expected growth for our legacy orthodontic business.

188.   The Q2 2018 10-Q represented that the Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures and concluded that they were effective and also stated that "[t]here have been no changes in the Company's internal controls over financial reporting that occurred during the quarter ended June 30, 2018, that have materially affected, or are likely to materially affect, its internal control over financial reporting."

189.   On this news, Dentsply shares declined approximately 18.6%, to close at $39.41 on August 7, 2018.

## DEMAND FUTILITY ALLEGATIONS
## FOR THE BOARD OF DENTSPLY

190.   Plaintiffs bring this action derivatively in the right and for the benefit of Dentsply to redress injuries suffered and to be suffered by Dentsply because of the

breaches of fiduciary duty and other wrongs as alleged herein by the Director Defendants.

191.   Plaintiffs will adequately and fairly represent the interests of Dentsply and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

192.   Plaintiffs are current owners of the Company stock and have continuously been owners of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiffs understands their obligation to hold stock throughout the duration of this action and is prepared to do so.

193.   Because of the facts set forth herein, Plaintiffs have not made a demand on the Board of Dentsply to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

194.   The Dentsply Board is currently comprised of twelve (12) members - Brandt, Casey, Alfano, Beecken, Coleman, Deese, Holden, Jetter, Kowaloff, Kraemer, Lunger, and Varon.  Thus, Plaintiffs are required to show that a majority of Defendants, *i.e.*, *six* (6), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

195.   The Director Defendants face a substantial likelihood of liability in this action because they caused Dentsply to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with Dentsply, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

196.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for Dentsply shareholders.

197.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiffs have not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

198.    Any suit by the Board to remedy these wrongs would likely expose the Company to further violations of the securities laws that would result in civil actions being filed; thus, the Board members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

199.    The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

200.    The Director Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT

**Non-Party Casey**

201.   Casey is the CEO of the Company and is also a Director of the Company.  Casey is not disinterested or independent, and therefore, is incapable of considering demand because he (as CEO) is an employee of the Company who derived substantially all his income from his employment with Dentsply, making him not independent.  As such, Casey cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.  Additionally, in its 2019 Proxy Statement Dentsply admits and acknowledges that Casey is not an independent director.

202.   This lack of independence and financial benefits received by Casey renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendants Lunger, Beecken, Deese, and Brandt (and Non-Party Varon)**

203.   Dentsply's Audit and Finance Committee is presently comprised of Defendants Lunger, Beecken, and non-party Varon.

204.   Defendant Lunger has continuously been a member and the Chairman of Dentsply's Audit and Finance Committee since at least 2014.

205.   Defendant Beecken has continuously been a member of Dentsply's Audit and Finance Committee since 2016 (post-Dentsply/Sirona merger).  Beecken was also the Chairman of Sirona's Audit Committee at least in 2013 and 2014.

206.   Non-Party Varon has continuously been a member of Dentsply's Audit and Finance Committee since 2018.

207.   Defendant Deese was a member of the Company's Audit and Finance Committee from at least 2014 through 2016 (pre-Dentsply/Sirona merger).

208.   Defendant Brandt was a member of the Company's Audit and Finance Committee in 2016 (post-Dentsply/Sirona merger).

209.   Pursuant to the Company's Audit and Finance Committee Charter, the members of the Audit Committee shall review the Company's: (i) annual consolidated audited financial statements, and the auditors' report thereon; (ii) interim consolidated financial statements, and any reports of the auditors with respect thereto; (iii) the related management's discussion and analysis of the Corporation's financial condition and results of operation ("MD&A"); and (iv) earnings releases and guidance.  Specifically, during the time when each was a member of the Audit and Finance Committee, Defendants Lunger, Beecken, Deese, Brandt and non-party Varon were tasked with reviewing the Company's compliance with applicable laws and regulations and reviewing and overseeing any policies, procedures and programs designed to promote such compliance.

210.   Defendants Lunger, Beecken, Deese, and Brandt (and non-party Varon) breached their fiduciary duties of due care, loyalty, and good faith, because as members of the Audit and Finance Committee, *inter alia*, they allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the deficiencies described above.

211.   The conduct of Defendant Beecken is particularly egregious because in addition to serving on Dentsply's Audit and Finance Committee, he was also the Chairman of Sirona's Audit Committee for the years leading up to the Dentsply/Sirona merger.

212.   Therefore, Lunger, Beecken, Deese, and Brandt face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Beecken and Kowaloff**

213.   Defendants Beecken and Kowaloff were Sirona Directors and members of its Audit Committee (with Mr. Beecken serving as its Chairman) pre-Dentsply/Sirona merger, and going back to at least 2013.  Defendants Beecken and Kowaloff joined the Dentsply Board of Directors at the time of the closing of this merger in February 2016.

214.   Although Sirona's Audit Committee charter is not available to Plaintiffs, Sirona's Form DEF 14A filed with the SEC on January 28, 2015 describes the primary function of this Audit Committee and its responsibilities as:

> The primary function of the Audit Committee is to serve as an independent and objective party to oversee our accounting and financial reporting processes and internal control system; to pre-approve all auditing and non-auditing services to be provided by our independent auditor; to review and oversee the audit efforts of our independent auditor; and to provide an open avenue of communication among the independent auditor, financial and senior management and our Board. The Audit Committee has responsibility and authority, among other matters […].

215.   Defendants Beecken and Kowaloff breached their fiduciary duties of due care, loyalty, and good faith as directors of Dentsply because, as members of Sirona's Audit Committee, they were in a particular and unique position to know of the matters specific to Sirona, including but not limited to its reliance on the Sirona/Patterson agreements with its minimum purchase requirements. Notwithstanding the foregoing, Defendants Beecken and Kowaloff breached their fiduciary duties of due care, loyalty, and good faith, because, *inter alia*, they allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the deficiencies described above.

216.   Based on the foregoing and as further alleged herein, Beecken and Kowaloff face a substantial likelihood of liability and any demand upon them is futile.

**Defendants Beecken, Jetter, Kowaloff, and Kraemer**

217.   Defendants Beecken, Jetter, Kowaloff, and Kraemer were each members of the Board of Directors of Sirona for the years leading up to the Dentsply/Sirona merger and joined the Dentsply Board of Directors at the time of the closing of this merger in February 2016.

218.   Defendant Beecken was Chairman of Sirona's Audit Committee in at least 2013 and 2014.

219.   Defendant Jetter was a member of Sirona's Nominating and Corporate Governance Committee in at least 2013 and 2014.

220.   Defendant Kowaloff was a member of Sirona's Audit Committee, Nominating and Corporate Governance Committee, and Compensation Committee in at least 2013 and 2014.

221.   Defendant Kraemer was Chairman of Sirona's Compensation Committee and a member of its Nominating and Corporate Governance Committee in at least 2013 and 2014.

222.   As members of Sirona's Board of Directors and further based on each defendant's committee membership, Defendants Beecken, Jetter, Kowaloff, and Kraemer were in a particular and unique position to know of the matters specific to Sirona, including but not limited to its reliance on the Sirona/Patterson agreements with its minimum purchase requirements.   Notwithstanding the foregoing, Defendants Beecken, Jetter, Kowaloff, and Kraemer breached their fiduciary duties of due care, loyalty, and good faith, because, *inter alia*, they allowed or permitted false and misleading statements to be disseminated in the

Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the deficiencies described above.

223.   Based on the foregoing and as further alleged herein, Beecken, Jetter, Kowaloff, and Kraemer face a substantial likelihood of liability and any demand upon them is futile.

**Defendants Brandt, Alfano, Coleman, Deese, and Lunger**

224.   Defendants Brandt, Alfano, Coleman, Deese, and Lunger were each directors of Dentsply Intl. at the time of the Dentsply/Sirona merger and continued as Dentsply directors thereafter.

225.   Regarding the Dentsply/Sirona merger, Defendants Brandt, Alfano, Coleman, Deese, and Lunger each failed to complete due diligence relating to the Distributors antitrust scheme as discussed herein and/or matters relating to the Sirona/Patterson agreements and the impact of these matters on this transaction, Dentsply's future sales and other business prospects, and on the Company's goodwill.

226.   Based on the foregoing and as further alleged herein, Brandt, Alfano, Coleman, Deese, and Lunger face a substantial likelihood of liability and any demand upon them is futile.

**Non-Party Casey, and Defendants Alfano, Brandt, Coleman, Deese, Lunger**

227.   Non-Party Casey is named as a defendant in the Securities Class Action.  Defendants Alfano, Brandt, Coleman, Deese, Lunger are each named as a defendant in the Securities Class Action.   Each of these individuals face a substantial likelihood of liability in the Securities Class Action relating to the facts and matters alleged herein and based thereon, any demand upon them in this action is futile.

## FIRST CAUSE OF ACTION

### Against the Director Defendants for Breach of Fiduciary Duty

228.   Plaintiffs incorporate by reference and re-allege each allegation contained above, as though fully set forth herein.

229.   The Director Defendants owed and owe Dentsply fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe Dentsply the highest obligation of good faith, fair dealing, loyalty and due care.

230.   The Director Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

231.   The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

232.   As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Dentsply has sustained significant and actual damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

233.   Plaintiffs, on behalf of Dentsply, have no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against the Director Defendants for Unjust Enrichment

234.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

235.   By their wrongful acts and omissions, the Director Defendants were unjustly enriched at the expense of and to the detriment of Dentsply in the form of salaries, bonuses, and other forms of compensation.

236.   Plaintiffs, as shareholders and representatives of Dentsply, seek restitution from the Director Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## THIRD CAUSE OF ACTION

### Against the Director Defendants for Gross Mismanagement

237.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

238.   By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

239.   As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

240.   As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.  Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against the Director Defendants for Waste of Corporate Assets

241.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

242.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

243.   As a result of the foregoing, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

244.   As a result of the waste of corporate assets, the Director Defendants are each liable to the Company.

245.   Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Director Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

246.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

247.   During the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose (a) the existence  and impact of the Distributors antitrust scheme and its impact on Dentsply's present and projected sales and other business opportunities; (b) the existence  and impact of the Sirona/Patterson agreements and its impact on Dentsply's present and projected sales and other business opportunities; and (c) that as a result, the Company's current business metrics and financial prospects were not as strong as it had led the market to believe during the Relevant Period.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

248.   As such, the Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)   employed devices, schemes, and artifices to defraud; and

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

249.   As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## SIXTH CAUSE OF ACTION

### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

250.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

251.   SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's proxy violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose (a) the existence and impact of the Distributors antitrust scheme and its impact on Dentsply's present and projected sales and other business opportunities; (b) the existence  and impact of the Sirona/Patterson agreements and its impact on Dentsply's present and projected sales and other business opportunities; and (c) that as a result, the

Company's current business metrics and financial prospects were not as strong as it had led the market to believe during the Relevant Period.

252.   In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the proxy statements were materially false and misleading.

253.   The misrepresentations and omissions in the proxy statements were material to Company stockholders and investors in determining how to vote on Dentsply's various proposals.  The proxy statements were an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

254.   The Company was damaged as a result of these defendants' material misrepresentations and omissions in the proxy statements.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment as follows:

A.      Declaring that Plaintiffs may maintain this action on behalf of the Company and that Plaintiffs are adequate representatives of the Company;

B.      Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and waste of corporate assets;

C.      Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED: April 29, 2019

**O'KELLY ERNST & JOYCE, LLC**

By: */s/ Ryan M. Ernst* _____
       Ryan M. Ernst, Esq.
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:   (212) 983-1300
Fax:   (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com

*Attorneys for Plaintiffs*