## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN BEHRMANN and NANCY BEHRMANN, Derivatively on Behalf of Nominal Defendant DENTSPLY SIRONA INC., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-772-RGA |
| | ) | |
| ERIC K. BRANDT, MICHAEL C. ALFANO, DAVID K. BEECKEN, MICHAEL J. COLEMAN, WILLIE A. DEESE, THOMAS JETTER, ARTHUR D. KOWALOFF, HARRY M. JANSEN KRAEMER, JR., and FRANCIS J. LUNGER, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| DENTSPLY SIRONA INC., a Delaware Corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

Presently before the court in this shareholder derivative action is the motion to dismiss pursuant to Federal Rules of Civil Procedure 23.1 and 12(b)(6), filed by defendants Eric K. Brandt, Michael C. Alfano, David K. Beecken, Michael J. Coleman, Willie A. Deese, Thomas Jetter, Arthur D. Kowaloff, Harry M. Jansen Kraemer, Jr., and Francis J. Lunger (collectively, the "Director Defendants").  (D.I. 15)  Nominal defendant Dentsply Sirona Inc., ("Dentsply" or "the Company;" together with the Director Defendants, "Defendants") joins in the motion to

dismiss pursuant to Federal Rule of Civil Procedure 23.1.  (*Id.*)  For the following reasons, I recommend that the court GRANT Defendants' motion to dismiss with prejudice.[1]

## II.    BACKGROUND

Plaintiffs John Behrmann and Nancy Behrmann ("Plaintiffs") are current shareholders of nominal defendant Dentsply, a company that develops, manufactures, and markets consumable dental products and dental equipment.  (D.I. 11 at ¶¶ 13-14, 130)  Plaintiffs filed this derivative shareholder action on April 29, 2019 against the Director Defendants, who are nine of the twelve Dentsply board members.  (D.I. 1; D.I. 11 at ¶¶ 15, 17, 19, 22, 25, 27, 30, 32, 34).  The remaining non-party board members include Dentsply's chief executive officer ("CEO") Donald M. Casey, Jr., as well as Betsy D. Holden and Leslie F. Varon (together with the Director Defendants, the "Board").  (*Id.* at ¶¶ 37–39)

Dentsply was formed on February 29, 2016 as a result of a merger between Dentsply International Inc. and Sirona Dental Systems, Inc. ("Sirona").  (*Id.* at ¶¶ 3, 92)  Prior to the merger, Sirona entered into exclusive distribution agreements ("EDAs") with Patterson Companies, Inc. ("Patterson"), a distributor of dental supplies and equipment.  (*Id.* at ¶¶ 94-97)  The terms of the EDAs extended beyond the date of the merger.  (*Id.* at ¶ 127)  Under the EDAs, Patterson was required to make minimum purchases of Sirona's products to retain its status as an exclusive distributor of those products.  (*Id.* at ¶ 98)  The terms of the EDAs also required Patterson to report its buying and inventory to Sirona on a monthly basis, although the amount of the minimum purchase requirements and the growth and product targets were not publicly disclosed.  (*Id.* at ¶¶ 98, 101-110)  Due to the reporting requirements under the EDAs, Sirona

---

[1] The briefing and related filings associated with the pending motion are found at D.I. 16, D.I. 17, D.I. 18, D.I. 19, D.I. 20, and D.I. 23.

(and after the merger, Dentsply) knew Patterson was buying excess inventory with insufficient end user demand.  (*Id.* at ¶ 112-114)

On November 22, 2016, Patterson announced its decision not to renew the EDAs, which would expire by their terms on September 30, 2017.  (D.I. 11 at ¶ 127)  After the expiration of its EDAs with Patterson, Dentsply relied on another distributor, Henry Schein, Inc. ("Schein"), to sell products that were previously available only to Patterson.  (*Id.* at ¶ 120)

 From February 20, 2014 to the present, the amended complaint alleges that Patterson, Schein, and a third distributor, Benco Dental Supply Co. ("Benco;" together with Patterson and Schein, the "Distributors"), entered into an anticompetitive conspiracy that allowed Dentsply to sell its products at artificially inflated prices and profit margins.  (*Id.* at ¶ 146)  The goal of the Distributors' conspiracy was to prevent the growth and influence of Group Purchasing Organizations ("GPOs"), which are dental buying groups made up of independent dental practices aggregating their collective purchasing power to obtain lower prices on dental supplies. (*Id.* at ¶ 133)  The Distributors projected that these GPOs would reduce their profits and cause a potential price war among Distributors.  (*Id.* at ¶ 135)

In response to the perceived threat of the GPOs to the Distributors' profit margins, the Distributors agreed not to provide discounts to GPOs, and they also blocked rival distributors from entering the dental products market and selling products to GPOs.  (*Id.* at ¶ 136)  Although Dentsply was aware of the alleged conspiracy among the Distributors, investors were not aware of the conspiracy or its impact on Dentsply's reported financial results.  (*Id.* at ¶ 137)

The Federal Trade Commission ("FTC") filed a complaint against the Distributors on February 12, 2018, alleging that the Distributors had entered into a horizontal agreement to restrain price competition by refusing to provide discounts to GPOs or compete for their

business.  (D.I. 11 at ¶¶ 137-38)  The Distributors' alleged conspiracy included boycotting trade

shows sponsored by state dental associations who had agreed to start GPOs for their members.

(*Id.* at ¶ 139)  The boycotts were effective in deterring state dental associations from starting

GPOs for their members.  (*Id.* at ¶ 140)  By 2017, however, the Distributors began to do business

with the GPOs and accepted the corresponding reduced profit margins.  (*Id.* at ¶ 141)  The

amended complaint references correspondence between Dentsply and the Distributors suggesting

that Dentsply knew of, and acquiesced in, the Distributors' conspiracy.  (*Id.* at ¶ 142)

Dentsply also discouraged dentists from buying dental supplies from online distributors

selling "gray market" products at discounted prices by falsely telling the dentists that these

products were of inferior quality and by filing litigation against unauthorized dealers.  (D.I. 11 at

¶ 143)  Dentsply coordinated with the Distributors against the gray market sellers by tracking the

purchasing history of end user dental offices in its SIEBEL database.  (*Id.* at ¶ 144)  The

amended complaint alleges that the Distributors and Dentsply field sales representatives would

provide data for inclusion in the SIEBEL database, and Dentsply's senior management had

access to the database.  (*Id.*)

The collaboration between Dentsply and the Distributors benefited both by preserving

their inflated prices and high profit margins.  (D.I. 11 at ¶ 146)  Patterson's adherence to the

minimum purchase requirements under the EDAs also enabled Dentsply to continue reporting

high sales, earnings, and margins.  (*Id.* at ¶¶ 203-05)  As a result, Dentsply was able to report

inflated revenues, profit margins, and earnings before and after the merger.  (*Id.* at ¶¶ 148, 203-

05)

The amended complaint also alleges that Dentsply overstated the value of its goodwill by

ignoring considerations of Patterson's excess inventory and the effects of the conspiracy among

4

the Distributors.  (D.I. 11 at ¶ 198)  For the first fiscal quarter of 2016 through the first fiscal

quarter of 2017, the Company reported a net goodwill between $5.79 billion and $6.06 billion,

which decreased to $4.54 billion by the fourth fiscal quarter of 2017.  (*Id.* at ¶ 199)  The

amended complaint alleges that these goodwill estimates were artificially inflated by the

anticompetitive scheme among the Distributors and Defendants' failure to consider the

likelihood that Patterson would not renew the EDAs.  (*Id.* at ¶ 202)

Defendants did not begin to acknowledge the impact of Patterson's nonrenewal of the

EDAs and the anticompetitive scheme among the Distributors until, between August 2017 and

August 2018, Dentsply was forced to disclose the impact of those schemes on revenues,

earnings, margins, and stock price.  (D.I. 11 at ¶¶ 204, 232-56)  In August 2018, Dentsply

disclosed that it was taking a significant goodwill impairment charge due in large part to its

wholesale issue with two of its distributors, as Patterson and Schein were both destocking their

inventory from Dentsply.  (*Id.* at ¶¶ 250-52)  The revelation in August 2018 of Dentsply's

wholesale issues caused the stock to decrease by almost 19 percent, to a five-year low of $39.41.

(*Id.* at ¶ 255)

## III.   LEGAL STANDARDS

### A.  Rule 23.1

A corporation's board of directors is generally tasked with deciding whether to initiate or

pursue a lawsuit on behalf of the corporation.  8 *Del. C.* § 141; *see also In re Citigroup Inc.

S'holder Derivative Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009). This responsibility flows from the

"cardinal precept" of Delaware corporate law that "directors, rather than shareholders, manage

the business and affairs of the corporation." *In re Citigroup*, 964 A.2d at 120 (quoting *Aronson v.*

*Lewis,* 473 A.2d 805, 811 (Del. 1984)).  This includes the decision to commence litigation or, alternatively, to abstain from filing suit.  *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990).

To maintain a derivative action on behalf of a corporation in accordance with Federal Rule of Civil Procedure 23.1, a plaintiff must "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors" and "the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1; *Raul v. Rynd*, 929 F. Supp. 2d 333, 340 (D. Del. 2013).  The goal of this demand requirement is to "allow[ ] the corporate machinery to self-correct problems and to safeguard against frivolous lawsuits."  *Id.*; *see also Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007).

The standard for pleading demand futility with particularity under Rule 23.1 is more stringent than the standard under Rule 12(b)(6).  *See Halpert v. Zhang*, 966 F. Supp. 2d 406, 415 (D. Del. 2013).  When considering the sufficiency of the pleading under Rule 23.1, the court is not obligated to accept as true "bald assertions, unsupported conclusions and unwarranted inferences, or allegations that are self-evidently false."  *In re Caterpillar Inc. Derivative Litig.*, C.A. No. 12-1076-LPS-CJB, 2014 WL 2587479, at *7 (D. Del. June 10, 2014) (citing *Raul*, 929 F. Supp. 2d at 341).  Moreover, although Rule 23.1 provides the heightened procedural standard for pleading derivative actions, the substantive rules for determining whether a plaintiff has satisfied the demand futility standard are governed by state law.  *Fares v. Lankau*, 953 F. Supp. 2d 524, 528 (D. Del. 2013) (citing *King ex rel. Cephalon Inc. v. Baldino*, 409 F. App'x 535 (3d Cir. 2010)). Therefore, "federal courts hearing shareholders' derivative actions involving state law claims . . . apply state substantive law to determine whether the facts demonstrate [that] demand would have been futile and can be

excused." *Kanter v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007); *see also Blasband v. Rales*, 971 F.2d 1034, 1047 (3d Cir. 1992).

Under Delaware law, the demand requirement may be excused if making a demand on the board of directors would be futile. *See Aronson*, 473 A.2d at 814-15, *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del. 2000). Satisfying the demand futility standard is a "difficult feat under Delaware law," *Ryan*, 918 A.2d at 352 n.23, because of the presumption that the directors "were faithful to their fiduciary duties," *Halpert*, 966 F. Supp. 2d at 411 (quoting *Beam ex. rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004)). In this regard,

> the entire question of demand futility is inextricably bound to issues of business judgment and the standard of that doctrine's applicability.... It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.

*Zomolosky v. Kullman*, 70 F. Supp. 3d 595, 602-03 (D. Del. 2014) (quoting *Aronson*, 473 A.2d at 812). The burden is on the party challenging the board's decision to rebut the presumption that the business judgment rule applies. *Levine v. Smith*, 591 A.2d 194, 205–06 (Del. 1991), *overruled on other grounds by Brehm*, 746 A.2d 244.

In the present case, there is no dispute that Plaintiffs challenge a violation of the Board's oversight duties, as opposed to an affirmative decision by the Board. (D.I. 11 at ¶ 268) Therefore, the test articulated in *Rales v. Blasband* applies. 634 A.2d 927, 930, 934 (Del. 1993). The analysis under *Rales* focuses on the Board's inability to exercise its business judgment in evaluating the demand itself. *In re Chemed Corp., S'holder Derivative Litig.*, C.A. No. 13-1854-LPS-CJB, 2015 WL 9460118, at *8-9 (D. Del. Dec. 23, 2015). The court must determine "whether or not the particularized factual allegations of a derivative stockholder complaint create

a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934; *see also Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). This can be achieved by pleading that a majority of the directors would face a "substantial likelihood" of personal liability by complying with a shareholder's demand for litigation. *Rales*, 634 A.2d at 936. Delaware courts have explained that, although the "mere threat of personal liability is insufficient to render a director interested in a transaction, plaintiffs are entitled to a reasonable inference of interestedness where a complaint indicates [that the requisite] 'substantial likelihood' of liability will be found." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007); *see also In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995).

In this case, Dentsply's certificate of incorporation contains a clause under 8 *Del. C.* § 102(b)(7),[2] which "exculpate[s] directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty." *Stone ex rel. AmSouth Bancorporation v. Rittner*, 911 A.2d 362, 370 (Del. 2006). As a result, "a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." *Wood*, 953 A.2d at 141 (citing *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003)); *see also In re GoPro, Inc.*, C.A. No. 2018-0784-JRS, 2020 WL 2036602, at *12 (Del. Ch. Apr. 28, 2020) ("Where, as here, there is an exculpatory clause in the corporate charter . . . Plaintiffs must well plead that the directors acted in bad faith when they allowed the alleged misstatements to be made and then failed to correct them."). Non-exculpated claims based on fraudulent, illegal, or bad faith conduct require a

---

[2] (D.I. 17, Ex. 19 at ¶ 9)

8

particularized showing "that the directors acted with scienter, *i.e.*, that they had actual or constructive knowledge that their conduct was legally improper." *Wood*, 953 A.2d at 141 (internal citations and quotation marks omitted). "The presumption of the business judgment rule, the protection of an exculpatory § 102(b)(7) provision, and the difficulty of proving a *Caremark* claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure to see the extent of a company's business risk." *In re Citigroup*, 964 A.2d at 125.

### B. Rule 12(b)(6)

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790-91 (3d Cir. 2016).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

The court's determination is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims." *In re Burlington Coat*

9

*Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal citations and quotation marks omitted). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## IV.   DISCUSSION

Defendants and Dentsply contend that the amended complaint should be dismissed in its entirety for failure to plead demand futility with the requisite level of specificity under Rule 23.1. (D.I. 16 at 11) Plaintiffs did not make a pre-suit demand. (D.I. 11 at ¶ 266) "[D]emand futility must be determined on a claim-by-claim basis. The fact that demand is futile as to one claim does not mean that it is futile as to the others." *Taylor v. Kissner*, 893 F. Supp. 2d 659, 666 (D. Del. 2012) (citing *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *18 (Del. Ch. May 5, 2010)). Demand futility must be pled with particularity not only as to each claim, but also as to each defendant. *See Owens v. Mayleben*, 2020 WL 748023, at *6 (Del. Ch. Feb. 13, 2020); *In re FedEx Corp. Deriv. Litig.*, C.A. No. 19-1227-LPS, 6/24/2020 Tr. at 66:18-67:5.[3]

### A.  Independence of Board Members

#### 1.  Parallel Securities Litigation

Plaintiffs first challenge the independence of the Dentsply board of directors, alleging that demand is futile because a majority of the board members are named as defendants in two parallel securities class action lawsuits pending before the New York Supreme Court and the

---

[3] This transcript is found at D.I. 23, Ex. A in the instant matter.

Eastern District of New York, respectively.  (D.I. 18 at 14-15)  According to Plaintiffs, the

ongoing nature of these parallel cases demonstrate that directors Brandt, Casey, Alfano,

Beecken, Coleman, Deese, Jetter, Kowaloff, Kraemer, and Lunger face potential liability and are

therefore unable to consider a demand impartially.  (*Id.*)

Plaintiffs' position is not sufficiently supported by the public record or the amended

pleading.  In the parallel action before the New York Supreme Court, the defendants' motion to

dismiss the action was granted.  *See In re Dentsply Sirona, Inc. S'holders Litig.*, 2019 WL

4695724, at *8 (N.Y. Sup. Ct. Sept. 26, 2019).  Consequently, the Dentsply board members

named in that action do not face potential liability.  In their December 6, 2019 answering brief,

Plaintiffs indicate that the claims against the directors in the state court action are still alive based

on an "order to show cause"[4] filed by the plaintiffs in that action, which sought leave to amend

the complaint.  (D.I. 18 at 14)  However, the New York Supreme Court has since issued a ruling

denying the plaintiffs' motion to vacate and further denying the plaintiffs' request for leave to

amend.  *See In re Dentsply Sirona, Inc. S'holders Litig.*, 2020 WL 587341 (N.Y. Sup. Ct. Feb. 6,

2020).

Plaintiffs argue that the parallel federal securities class action remains pending in the

Eastern District of New York, potentially resulting in liability for Dentsply directors Brandt,

Casey, Alfano, Coleman, Deese, and Lunger.  (D.I. 18 at 14-15)  The public docket in the

parallel federal securities class action confirms that a motion to dismiss remains pending and the

litigation is ongoing.  (E.D.N.Y. C.A. No. 18-7253, D.I. 42)  But Plaintiffs have not established

that being named in the ongoing federal securities class action sufficiently impairs Defendants'

---

[4] The New York Supreme Court identified this as a motion to vacate the September 30, 2019
judgment and to file a second amended complaint.  *See In re Dentsply Sirona*, 2020 WL 587341,
at *1.

ability to impartially consider a demand in this action.  To the contrary, the Court of Chancery

has rejected the notion that the threat of liability in a related federal action would impair a

board's ability to impartially consider a plaintiff's demand in a derivative action.  *See Seminaris*

*v. Landa*, 662 A.2d 1350, 1355 (Del. Ch. 1995) ("Plaintiff is merely uttering a slightly altered

version of the discredited refrain—'you can't expect directors to sue themselves.'") (quoting

*Decker v. Clausen*, 1989 WL 133617 (Del. Ch. Nov. 6, 1989)).  As in *Seminaris*, Plaintiffs'

amended pleading "fails to demonstrate that the directors risked increasing their exposure to

personal liability . . . in the related actions if they pursued [Plaintiffs'] claims" in the instant

derivative action.  *Id.*  Instead, the amended pleading identifies the Dentsply board members

named in the federal securities class action and asserts that "[e]ach of these individuals face[s] a

substantial likelihood of liability" in the federal securities class action "relating to the facts and

matters alleged herein and based thereon."  (D.I. 11 at ¶ 301)

Plaintiffs rely on the Court of Chancery's decision in *Pfeiffer v. Toll*, 989 A.2d 683, 690

(Del. Ch. 2010) in support of their position that a majority of the Board cannot consider a

demand impartially when a companion federal securities action remains pending.  (D.I. 18 at 15)

But the Court of Chancery's holding in *Pfeiffer* was based largely on the denial of a motion to

dismiss "under the rigorous standards for pleading securities fraud" in the companion federal

securities action.  *Pfeiffer*, 989 A.2d at 690.  The federal court considered the same factual

allegations that were before the Court of Chancery in ruling on the motion to dismiss, holding

that the pleading adequately alleged material misstatements and the requisite scienter by board

members.  *Id.*  Accordingly, the court in *Pfeiffer* reasoned that it was not possible for the

defendants to consider demand impartially because it would undercut or compromise the defense

in the federal securities action.  *See id.*  Because the Eastern District of New York has not yet

issued a ruling on the pending motion to dismiss, the potential liability faced by the Dentsply directors is not as great as the potential liability of the directors in *Pfeiffer*.

### 2. CEO Casey's Compensation

Plaintiffs further allege that nonparty director Casey lacks independence because he derives substantially all of his income from his employment position as CEO of Dentsply.  (D.I. 18 at 15; D.I. 11 at ¶ 274)  In reply, Defendants contend that a CEO/director is independent under Delaware law in the absence of a controlling stockholder or a personal interest in the subject matter.  (D.I. 20 at 6 n.2)

The amended complaint does not adequately plead that Casey lacks independence solely based on his compensation as Dentsply's CEO.  "Under Delaware law, merely being employed by a corporation is not, by itself, sufficient to create a reasonable doubt as to the independence of a director."  *In re NutriSystem, Inc. Derivative Litig.*, 666 F. Supp. 2d 501, 515 (E.D. Pa. 2009).  Although a "lack of independence may be found where there is a substantial financial interest in maintaining employment positions," *In re Maxwell Techs., Inc. Derivative Litig.*, 2014 WL 2212155, at *4 (S.D. Cal. May 27, 2014) (citing *Rales*, 634 A.2d at 936–37), the lack of independence generally arises from an interest in retaining employment, as opposed to the compensation itself, *see Rales*, 634 A.2d at 936-37.  The amended complaint does not allege that Casey's salary allows the Board to exert influence over him, or vice versa.  *See In re Maxwell*, 2014 WL 2212155, at *6 ("Plaintiffs do not explain how [the director's] salary allows him domination or control of others, or how it allows an interested party to dominate or control him."); *see also Rales*, 634 A.2d at 937.

The amended complaint's assertion that Casey lacks independence based on an alleged admission in a 2019 Proxy Statement similarly fails.  (D.I. 11 at ¶ 274)  "[C]ourts have

determined that being deemed 'not independent' for NASDAQ purposes does not bear upon independence for demand futility purposes." *In re Maxwell*, 2014 WL 2212155, at *6; *see also Sandys v. Pincus*, 152 A.3d 124, 131–32 (Del. 2016) ("[T]he Delaware independence standard is context specific and does not perfectly marry with the standards of the stock exchange in all cases."). Accordingly, representations in a Proxy Statement regarding a director's lack of independence cannot properly be extended to the demand futility analysis.

### B.  Material Misstatements or Omissions

Defendants contend that Plaintiffs have not identified any actionable misstatements or omissions by a Board member in the amended pleading, as evidenced by the New York Supreme Court's rejection of the same claims in the parallel securities litigation. (D.I. 16 at 14)  In response, Plaintiffs allege that demand is excused because the entire Board faces a substantial likelihood of liability for making or knowingly permitting misrepresentations regarding the sustainability of Dentsply's financial results. (D.I. 18 at 16-17)  For the following reasons, the amended complaint fails to adequately plead a material misstatement or omission by the Director Defendants.

#### 1.  Valuations of goodwill and intangible assets

Defendants contend that Dentsply's estimates regarding allocations of goodwill and the timing of impairment charges are not actionable misstatements because they reflect a business judgment of the company's future prospects that should not be viewed in hindsight. (D.I. 16 at 17; D.I. 20 at 13)  In response, Plaintiffs argue that the goodwill estimates included in the amended complaint are actionable misstatements because those estimates do not account for Defendants' knowledge of Patterson's excess inventory, which was disclosed in the EDAs, or the Distributors' anticompetitive scheme. (D.I. 18 at 24-25)  Plaintiffs emphasize that these

misstatements were material because the goodwill valuation amounted to half of Dentsply's reported assets at the time of the merger.  (*Id.*)

"[G]oodwill estimates are opinion statements because they depend on management's determination of the fair value of the assets acquired and liabilities assumed, which are not matters of objective fact and will vary depending on the particular methodology and assumptions used." *N. Collier Fire Ctrl. & Rescue Dist. Firefighter Pension Plan & Plymouth County Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016) (internal quotation marks and citations omitted).  In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*, the Supreme Court held that an opinion statement is actionable if:  (1) the speaker did not hold the belief professed, (2) the supporting facts supplied were untrue, or (3) the stated opinion, though sincerely held and otherwise true as a matter of fact, omitted information whose omission made the stated opinion misleading to a reasonable investor.  *See Tongue v. Sanofi* , 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 575 U.S. 175 (2015)).  The amended complaint does not allege that the supporting facts underlying Defendants' goodwill calculation were untrue, nor does the complaint expressly allege that Defendants did not believe their opinions at the time those opinions were made.  The focus of Plaintiffs' argument, therefore, centers on whether Defendants omitted information that rendered the opinion misleading to a reasonable investor.  (D.I. 18 at 24)

The Supreme Court has held that, "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," then those omissions are actionable.  *Omnicare*, 575 U.S. at 189.  The amended complaint states that goodwill estimates in the Registration Statement were artificially inflated due to Defendants'

failure to account for the effects of the anticompetitive scheme and Patterson's excess inventory. (*Id.* at ¶¶ 149-51, 198)  But Defendants' failure to account for Patterson's inventory glut and the Distributors' anticompetitive scheme in their goodwill calculation does not amount to an actionable misstatement where, as here, the amended complaint does not adequately allege that the Director Defendants had knowledge of those facts.  *See* § IV.C.2, *infra*.  Defendants could not incorporate into the Registration Statement's goodwill calculations considerations which were not known to them at the time.  *See Tongue*, 816 F.3d at 212 (noting that "Defendants were only tasked with making statements that fairly align[ed] with the information in the issuer's possession at the time." (internal citations and quotation marks omitted)).

The amended complaint also states that Dentsply belatedly took significant goodwill impairments in 2017 and 2018.  (D.I. 11 at ¶¶ 227, 250)  Plaintiffs plead that, in August 2017, Dentsply recorded a goodwill impairment charge and disclosed it had "observed an increase in competition, unfavorable changes in the end-user business model as well as changes in channels of distribution for the company and its competitors."  (*Id.* at ¶ 227)  In August 2018, Dentsply again recorded a substantial goodwill impairment charge and "announced that it was introducing a 'restructuring program' to address diminished product demand and dwindling margins."  (*Id.* at ¶ 250)

Where, as here, an alleged omission is based on the timing of an accounting write down, it is not enough to allege the write down should have occurred earlier.  *See Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) ("Because the securities laws do not allow fraud by hindsight claims, after-the-fact allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." (internal citations and quotation marks omitted)).

Instead, the pleading must include factual allegations from which a reader could infer Defendants intentionally or recklessly failed to take write downs previously.  *See id.*; *see also In re ForceField Energy Sec. Litig.*, 2017 WL 1319802, at \*13 (S.D.N.Y. Mar. 29, 2017).  For the reasons previously stated, and for the reasons stated at § IV.C.2, *infra*, Plaintiffs have not made such a showing.  The pleaded allegations instead "amount to fundamental disagreements with Defendants' business judgments," and are therefore not actionable misstatements.  *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 303.

### 2.  Duty to disclose wrongdoing

Defendants allege that the Board had no duty to disclose the alleged antitrust conspiracy prior to charges of criminal conduct, nor did it have a duty to speculate regarding the anticipated effects of Patterson's excess inventory.  (D.I. 16 at 14-15)  In response, Plaintiffs concede that Defendants do not have a duty to speculate about the risk of a future investigation.  (D.I. 18 at 25)  Nonetheless, Plaintiffs argue that Defendants had a duty to disclose information concerning the source of Dentsply's financial success in this case because Defendants put the topic of Dentsply's financial success at issue in their disclosures.  (*Id.* at 25-26)  In the absence of disclosures regarding the anticompetitive scheme, Plaintiffs contend that Defendants' public statements about Dentsply's financial success were misleading to investors.  (*Id.*)

Plaintiffs' arguments regarding Defendants' duty to disclose the Distributors' anticompetitive scheme were previously considered and rejected by the New York Supreme Court in the parallel securities litigation.  *See Dentsply Sirona*, 2019 WL 4695724, at \*5.  There, as here, Plaintiffs identified allegedly misleading statements in the Registration Statement, Dentsply's 2014 Form 10-K, and Sirona's 2015 Form 10-K.  *Id.* at \*4; (D.I. 18 at 26-27; D.I. 11

at ¶¶ 156-59, 210-11).  Concluding that the failure to disclose the Distributors' anticompetitive

scheme was not materially misleading, the court stated that

> Plaintiffs' statements concerning competition and the scope and prospects of
> Dentsply's and Sirona's business are "expressions of puffery and corporate
> optimism," and accordingly, "do not give rise to securities violations." *Rombach
> v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  The cases Plaintiffs cite, in support
> of their argument that statements about competition are misleading absent
> disclosure of an existing anticompetitive scheme, are distinguishable in that those
> cases involved allegations that the *defendant companies themselves* participated in
> the anticompetitive schemes.  *See, e.g., Speakes v. Taro Pharm. Indus. Ltd.*, 2018
> WL 4572987 (S.D.N.Y. Sept. 24, 2018) (where the defendant company was
> allegedly part of a drug price fixing scheme, and plaintiffs' allegations contained
> details of that participation, the court found that defendant's statements about
> competition were misleading without disclosure of its anticompetitive conduct).

*Dentsply Sirona*, 2019 WL 4695724, at *5.

As in the parallel securities litigation before the New York Supreme Court, Plaintiffs

again rely on *Speakes v. Taro Pharmaceutical Industries, Ltd.* without acknowledging the

distinction that the defendant company itself was allegedly part of the price fixing scheme in that

case.  (D.I. 18 at 27-28); *see Speakes*, 2018 WL 4572987, at *6 (S.D.N.Y. Sept. 24, 2018); *In re

Sotheby's Holdings Inc. Sec. Litig.*, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000)

(addressing a defendant who colluded with a competitor).  As the New York Supreme Court

explained,

> Plaintiffs allege that the Alleged Anticompetitive Scheme was perpetrated by
> Defendants' customers, the Distributors; the CAC does not allege that Defendants
> were participants in the Alleged Anticompetitive Scheme.  In these circumstances,
> Defendants' failure to disclose the Distributors' Alleged Anticompetitive Scheme
> did not cause their general statements about the state of market conditions to be
> misleading. . . .

*Dentsply Sirona*, 2019 WL 4695724, at *5.  Plaintiffs cite no authority requiring a defendant to

disclose the alleged anticompetitive scheme in which the defendant was allegedly "well aware

18

of" the scheme but was not a participant.  (D.I. 11 at ¶ 142)  The court finds the reasoning of the New York Supreme Court persuasive.

Similarly, the amended complaint does not adequately plead that Defendants had a duty to disclose Patterson's stockpiling of inventory to avoid misleading investors about the likelihood that Patterson would terminate the EDAs.  (D.I. 11 at ¶¶ 212-13)  In the parallel securities litigation, the New York Supreme Court considered the issue and determined that Defendants' statements of existing and growing demand were unactionable statements of opinion, holding that Defendants had no duty to speculate about the likelihood Patterson would terminate the EDAs:

> Plaintiffs do not allege that at the time of the Registration Statement, Patterson had terminated its Exclusivity Agreement or notified Defendants of its intention to terminate. Where, as here, "an outcome is merely speculative, the duty to disclose does not attach." *In re Express Scripts Holding Co. Sec. Litig.*, 16 Civ. 3338, 2017 WL 3278930 at *11 (S.D.N.Y. Aug. 1, 2017) (holding that the duty to disclose does not arise until customer made a "definitive statement" of its intent to terminate its business relationship with the defendant corporation); *see also River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, 17 CV 9193, 2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019).

*Dentsply Sirona*, 2019 WL 4695724, at *6.  The Director Defendants had no duty to disclose the possibility that Patterson would not renew the EDAs when such a disclosure would have been speculative.  *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

Defendants contend that Plaintiffs do not contest the accuracy of Dentsply's disclosures regarding its own financial results, nor do they explain how these disclosures put at issue the topic of uncharged antitrust conduct among the Distributors or Patterson's stockpiling of excess inventory.  (D.I. 20 at 15)  Absent inaccuracies in a company's reported financial results,

statements or omissions regarding those financial statements are generally not actionable.  *See Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, 2018 WL 1725574, at *7 (S.D.N.Y. Mar. 30, 2018) (holding that, because the "financial statements were (literally) accurate," the challenged "statements or omissions concerning [company's] financial statements are not actionable"); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403-04 (S.D.N.Y. 2016) ("the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability").  Plaintiffs have not established that Defendants had a duty to disclose an alleged conspiracy among the Distributors or the future possibility that Patterson would not renew the EDAs.[5]

### 3.  Positive statements about future prospects

Defendants contend that Dentsply's generic, positive statements about its future prospects are non-actionable, permissible "expressions of puffery and corporate optimism."  (D.I. 16 at 16-17)  In response, Plaintiffs allege that a company's positive statements amount to more than puffery when the underlying facts render the company's portrayal misleading.  (D.I. 18 at 29)  According to Plaintiffs, allegations in the amended complaint regarding Dentsply's "strengths" in operating in a "highly competitive" market concealed the fact that it was the beneficiary of the Distributors' antitrust conspiracy.  (*Id.*)  Plaintiffs also argue that allegations regarding Dentsply's new "go-to-market" strategy as a means for "accelerating growth" are actionable misstatements in light of the Director Defendants' knowledge of the inventory glut at Patterson.  (*Id.*)

---

[5]  As discussed at § IV.C.2, *infra*, the amended complaint does not adequately allege that the Director Defendants were aware of Patterson's excess inventory or the alleged anticompetitive conspiracy among the Distributors.

The pleaded allegations challenged by Plaintiffs do not amount to actionable misrepresentations.  In addressing the "highly competitive" U.S. dental market, the amended complaint quotes Dentsply's Form 10-Ks from 2013 to 2016 for the proposition that "[c]ompetition in the dental and medical products industries is based primarily upon product performance, quality, safety and ease of use, as well as price, customer service, innovation and acceptance by professionals, technicians and patients."  (D.I. 11 at ¶¶ 156-58)  These vague remarks about the nature of competition in the relevant market are not actionable, factual misrepresentations.  The list of factors affecting competition does not purport to be exhaustive, and for the reasons set forth at § IV.C.2.a, *infra*, the amended pleading does not adequately allege that the Director Defendants were themselves aware of the Distributors' anticompetitive scheme.

Statements in the amended complaint regarding Defendants' "go-to-market" strategy to "accelerat[e] growth" also fail to amount to actionable misrepresentations, and instead represent "non-specific statement[s] of optimism or hope" about future prospects.  *Schwartz v. Perseon Corp.*, 175 F. Supp. 3d 390, 402 (D. Del. 2016).  These representations describe Dentsply's future plans to expand its distribution through partnerships with Patterson and Henry Schein. (D.I. 11 at ¶¶ 178-79, 182)  But "statements of expectation or opinion about the future of the company and the hoped for results of business strategies" are "the softest of information," and are "generally not actionable under Delaware law."  *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 209 (Del. Ch. 2006).

### C. Breach of Fiduciary Duty Under *Caremark*[6]

The amended complaint alleges that Defendants breached their fiduciary duty of loyalty[7] by failing to exercise appropriate oversight regarding the disclosure of false or misleading information in Dentsply's corporate disclosures, despite the fact that they either knew or should have known of the allegedly false or misleading statements.  (D.I. 11 at ¶ 269)  These allegations are subject to the *Rales* test for demand futility and are governed by the *Caremark* standard.  *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017).  Under *Caremark*, Plaintiffs must plead that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone*, 911 A.2d at 370; *see also In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971-72 (Del. Ch. 1996).

---

[6] Where, as here, the causes of action for breach of fiduciary duty are based on the duty of loyalty and require a showing of bad faith, a Rule 23.1 motion to dismiss may be granted for failure to plead scienter even if the pleading adequately identifies false or misleading statements. *See Ellis v. Gonzalez*,  2018 WL 3360816, at *1 (Del. Ch. July 10, 2018), *aff'd*, *Ellis ex rel. AbbVie Inc. v. Gonzalez*, 205 A.3d 821 (Del. 2019).  Absent non-conclusory allegations that a majority of the board knew or should have known of the false or misleading statements, identifying materially false or misleading statements in the pleading is not sufficient to plead a duty of loyalty claim under Rule 23.1.  *Id.*

[7] The named Director Defendants are immunized from monetary liability for breaches of the duty of care under the exculpatory provision of Dentsply's certificate of incorporation.  (D.I. 17, Ex. 19 at ¶ 9); *see Taylor*, 893 F. Supp. 2d at 666.  The exculpatory provision does not extend to breaches of the duty of loyalty under *Caremark*.  *See id.*; *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011) (noting that provisions under 8 *Del. C.* § 102(b)(7) do not exculpate directors from liability for claims based on bad faith conduct).  "The presumption of the business judgment rule, the protection of an exculpatory § 102(b)(7) provision, and the difficulty of proving a *Caremark* claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure to see the extent of a company's business risk."  *In re Citigroup*, 964 A.2d at 125.  "Where, as here, there is an exculpatory clause in the corporate charter . . . Plaintiffs must well plead that the directors acted in bad faith when they allowed the alleged misstatements to be made and then failed to correct them."  *In re GoPro, Inc.*, 2020 WL 2036602, at *12 (Del. Ch. Apr. 28, 2020) (citing *Ellis v. Gonzalez*, 2018 WL 3360816, at *11 (Del. Ch. July 10, 2018)).

Failure of oversight is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l*, 698 A.2d at 967. Pleading oversight liability under *Caremark* requires allegations of conscious bad faith by the directors. *In re Citigroup*, 964 A.2d at 123; *Stone*, 911 A.2d at 369. To establish bad faith under *Caremark*, Plaintiffs must plead that "the directors [completely] fail[ed] to implement any reporting or information system or controls[,] or . . . having implemented such a system or controls, consciously fail[ed] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *In re GoPro, Inc.*, 2020 WL 2036602, at *11 (Del. Ch. Apr. 28, 2020) (quoting *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019)). "Thus, to establish oversight liability a plaintiff must show the directors *knew* they were not discharging their fiduciary obligations or that the directors demonstrated a *conscious* disregard for their responsibilities such as by failing to act in the face of a known duty to act." *In re Citigroup*, 964 A.2d at 123 (emphasis in original).

## 1. First prong of *Caremark*

To successfully plead a cause of action under the first prong of *Caremark*, Plaintiffs must show that "the directors utterly failed to implement any reporting or information system or controls." *Stone*, 911 A.2d at 370. Where the board has in place a reasonable board-level system of monitoring and reporting, deference is given to the board and *Caremark* claims are dismissed "even when illegal or harmful company activities escaped detection." *Marchand*, 212 A.3d at 821. A pleading that concedes "the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors, or consultants" generally fails to pass muster under the first prong of *Caremark*. *Id.* at 823.

23

In support of the motion to dismiss under the first prong of *Caremark*, Defendants contend that the amended complaint expressly acknowledges the existence of Dentsply's reporting systems and controls, including various committees, the Dentsply Sirona Code, and committee charters.  (D.I. 16 at 20)  In response, Plaintiffs point to the portions of the amended complaint describing Patterson's inventory levels building to excessive levels at the time board members were conducting their due diligence for the merger, suggesting that the board members were aware of the inventory glut.  (D.I. 18 at 19-21; D.I. 11 at ¶ 114)  Plaintiffs do not address the existence of the Audit Committee and other committees at Dentsply, nor do they explain how Defendants' alleged knowledge of the inventory glut demonstrates an "utter failure" by Defendants to implement any reporting or information system or controls.  *Marchand*, 212 A.3d at 809.

The amended complaint does not adequately plead demand futility under the first prong of *Caremark* because it expressly acknowledges the existence of board-level monitoring and oversight systems at Dentsply.  The Delaware Supreme Court recently observed that, "[i]n decisions dismissing *Caremark* claims, the plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight, such as a relevant committee[.]"  *Marchand*, 212 A.3d at 823.  Here, the amended complaint concedes the existence of board-level monitoring and oversight systems by identifying four standing committees comprised of independent Dentsply directors:  The Audit and Finance Committee, the Corporate Governance and Nominating Committee, the Human Resources Committee, and the Executive Committee.  (D.I. 11 at ¶ 60)  The amended complaint explains that the Audit Committee was set up to "review[] the Company's compliance with applicable laws and regulations and review[] and

oversee[] any policies, procedures and programs designated to promote such compliance."  (*Id.* at ¶ 283)

The Audit Committee Charter charges the Audit Committee with "responsibility for monitoring and overseeing the management, gathering and reporting of financial data and information" as well as overseeing Dentsply's "process for monitoring compliance with laws and regulations and the Company's Code of Business Conduct and Ethics."  (D.I. 11 at ¶¶ 66-67)  In accordance with these responsibilities, the Audit Committee is to "review and discuss with management, internal audit and the independent accountants" various aspects of Dentsply's financial statements, including "any major issues regarding significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements." (*Id.* at ¶ 67)  The Audit Committee is also responsible for "discuss[ing] with management the Company's policies with respect to earnings press releases and all financial information, such as earnings guidance, provided to analysts and rating agencies, including the types of information to be disclosed and the types of presentations to be made."  (*Id.*)  These pleaded allegations are comparable to the facts alleged in cases where plaintiffs did not bother to challenge the existence of oversight and control measures under the first prong of *Caremark*:

> The complaint alleges that the board tasked numerous committees with the responsibility of assisting in its oversight—reviewing compliance issues, auditing Citigroup's internal controls, reviewing risk-management activities, etc. There is no real dispute that Citigroup's board had sufficient reporting controls and procedures to perform its oversight function during the relevant period.

*Brautigam v. Rubin*, 55 F. Supp. 3d 499, 506 (S.D.N.Y. 2014), *aff'd*, 618 F. App'x 723 (2d Cir. 2015); *see also In re GoPro*, 2020 WL 2036602, at *12 n.152 (finding no plausible argument under *Caremark*'s first prong where the Board maintained an active Audit Committee and GoPro had a supply chain monitoring system which was regularly reviewed by the Audit Committee

and the Board); *Goldman Sachs*, 2011 WL 4826104, at *23 (noting that Goldman had an audit committee to assist the board in oversight, and defendants implemented a risk management system to keep the board reasonably informed). Accordingly, the amended complaint adequately establishes the existence of monitoring and oversight systems under the first prong of *Caremark*.

To the extent that Plaintiffs contend Defendants must have had knowledge of the wrongful conduct as a result of these internal controls and monitoring systems, "courts have repeatedly rejected the attempt to use the fact that a company had internal controls as proof that the board must have been aware of alleged wrongdoing." *See Brautigam*, 55 F. Supp. 3d at 506 (citing *In re Goldman Sachs Mortgage Servicing S'holder Derivative Litig.*, 42 F.Supp.3d 473 (S.D.N.Y. Aug. 14, 2012)). Plaintiffs invoke the core operations doctrine, without explaining how the doctrine applies in the context of *Caremark*'s first prong. (D.I. 18 at 20) (citing *Pfeiffer*, 989 A.2d at 693, which did not address *Caremark*). "The core operations doctrine allows a court, in certain circumstances, to infer board knowledge of matters relating to a corporation's core product." *Owens v. Mayleben*, 2020 WL 748023, at *8 n.106 (Del. Ch. Feb. 13, 2020) (citing *In re Fitbit, Inc. S'holder Derivative Litig.*, 2018 WL 6587159, at *15 n.179 (Del. Ch. Dec. 14, 2018)). This doctrine goes to the issue of scienter. *See id.* (holding that a plaintiff "must plead other particularized facts that support an inference of director knowledge [under Rule 23.1] before the core operations doctrine may be invoked to enhance that inference.").

## 2.  Second prong of *Caremark*

Under the second prong of *Caremark*, Plaintiffs "must plead the existence of facts suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed." *Desimone v. Barrows*, 924 A.2d

908, 940 (Del. Ch. 2007) (citing *Stone*, 911 A.2d at 373). "One way to satisfy a plaintiff's burden in a *Caremark* case is to demonstrate that the directors consciously failed to act after learning about evidence of illegality—[such as becoming aware of] the proverbial red flag." *In re Chemed Corp.*, 2015 WL 9460118, at *24 (internal quotation marks and citations omitted). Here, Plaintiffs identify two red flags ignored by Defendants in Dentsply's corporate disclosures: (1) the anticompetitive conspiracy among the Distributors, and (2) the inventory stockpile at Patterson. (D.I. 18 at 27)

### a. The Distributors' alleged antitrust conspiracy

Defendants contend that the amended complaint fails to adequately demonstrate the Board's knowledge of the Distributors' antitrust conspiracy because it does not identify facts specific to each director, and instead alleges that Defendants collectively "caused" or "allowed" Dentsply and its predecessors to disseminate false and misleading information. (D.I. 16 at 21-22) According to Defendants, the amended complaint fails to identify any "red flags" showing that the Board was aware of the inadequacy of Dentsply's internal controls and chose to do nothing about it. (*Id.* at 27; D.I. 20 at 8)

Plaintiffs argue that the Board chose to ignore red flags indicative of the risks or problems facing Dentsply. (D.I. 18 at 21) Plaintiffs point to allegations in the amended complaint suggesting that defendants were "aware of" the Distributors' anticompetitive scheme, as evidenced by email communications between national and regional managers from Dentsply and the Distributors indicating their intention to boycott state association dental meetings and block competition by combatting gray market sellers. (*Id.* at 9-10)[8] As a result, Plaintiffs

---

[8] Plaintiffs did not address Defendants' knowledge of the Distributors' anticompetitive scheme in their *Caremark* analysis. (D.I. 18 at 21-23) Instead, Plaintiffs identified pleaded allegations of Defendants' knowledge of the scheme in their description of the factual background. (*Id.* at 9-11)

contend that Defendants knew or should have known of the falsity of statements made in Dentsply's corporate disclosures regarding the "highly competitive" dental products market and artificially inflated financial results and product pricing.  (*Id.* at 11)

The amended complaint does not adequately allege Defendants' knowledge of the anticompetitive scheme among the Distributors.  The portions of the amended pleading cited by Plaintiffs identify communications between representatives of the Distributors and national or regional managers of Dentsply discussing ways to restrict competition.  (D.I. 11 at ¶¶ 142-43) Although these communications supposedly form the basis of the Director Defendants' knowledge of the anticompetitive conspiracy in the amended complaint, the pleading does not suggest that any of the Director Defendants were specifically aware of the communications. "While knowledge of the core activities of a business may be imputed to its highest officials in some circumstances, such imputation is done cautiously and only where plaintiffs have pleaded particularized allegations showing that defendants had ample reason to know of the falsity of their statements."  *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 400 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) (internal citations and quotation marks omitted).  Plaintiffs cite no authority explaining how the alleged knowledge of certain national or regional managers at Dentsply may be attributed to Dentsply or the Director Defendants in the absence of particularized allegations supporting such attribution.

The same is true of the pleaded allegations regarding Dentsply's SIEBEL database, which Dentsply allegedly "used to coordinate with the Distributors in efforts to police gray market sales."  (D.I. 11 at ¶¶ 144-45)  Although the amended complaint asserts that "senior management [had] access to the SIEBEL database," it does not indicate that the Director Defendants knew of its existence or had access to it.  (*Id.* at ¶ 144); *see City of Roseville*, 713 F.

Supp. 2d at 400.  Because Plaintiffs have failed to plead that the Director Defendants had "ample reason" to know of the conspiracy, the court cannot reasonably infer that the Director Defendants acted with the requisite scienter.  *City of Roseville*, 713 F. Supp. 2d at 400-01 (concluding that "plaintiffs have simply not provided any facts to support a conclusion" that specific, individual directors "were aware of the conspiracy, or should have been aware of it," prior to the disclosure of an agency investigation).  Accordingly, Plaintiffs have failed to show that Defendants face a substantial likelihood of liability based on the Distributors' anticompetitive conspiracy for purposes of the demand futility analysis under Rule 23.1.  *See Stone*, 911 A.2d at 370.

### b.   Patterson's excess inventory

Because the EDAs required Patterson to provide detailed information on a monthly basis to Dentsply and its predecessor, Plaintiffs contend that the Director Defendants were on notice of Patterson's excessive inventory.  (D.I. 18 at 22)  According to Defendants, however, the amended complaint offers only speculation regarding whether the monthly EDA reports from Patterson contained the information necessary to identify the unsustainability of Patterson's inventory acquisitions.  (D.I. 20 at 9-10)  Moreover, Defendants note that the amended complaint does not confirm the delivery of any specific EDA reports to the Board.  (D.I. 16 at 26; D.I. 20 at 12)

The amended complaint quotes portions of the EDAs outlining Patterson's monthly reporting requirements, which were to include "the sales targets and results for each of Patterson's branch offices for that month[,] a schedule of Patterson's sales for that month with respect to each product included within the Contractual Products," and a rolling twelve month forecast.  (D.I. 11 at ¶¶ 107-08, 110-11)  The stated purpose of these monthly reporting requirements was "to ascertain whether Patterson is 'on target' to meet its annual and quarterly

purchase requirements hereunder."  (*Id.* at ¶¶ 107, 110)  The EDAs also required Patterson to report on a quarterly basis "order entry/turnover and backlog, sorted out as to number of units and value, relative to sale regions," and "stock of Contractual Products relative to sale branches." (*Id.* at ¶¶ 106, 109)  The amended complaint states that, "[a]s a result of all these reporting requirements," Dentsply and its predecessor  "knew, on a monthly basis, that there was insufficient end user demand for the products Patterson was buying from the Company, and they knew whether Patterson was overbuying [inventory] and by how much."  (*Id.* at ¶ 112; *see also* ¶ 218)

Although these allegations describe in detail the reporting requirements under the EDAs, they do not identify data revealed by specific EDA reports that contradicted the alleged misrepresentations made by the Director Defendants.  The amended complaint also fails to describe with specificity which Director Defendants received the EDA reports, and instead generically alleges that Dentsply and its predecessor received the EDA reports.  (D.I. 11 at ¶¶ 218-19)  As set forth below, courts have rejected the sufficiency of similar allegations to establish scienter.

In *Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American Express Co.*, the court held that the pleading failed to establish the defendants knew or should have known their public statements were inaccurate because it did not specifically identify the reports or statements contradicting the defendants' alleged misrepresentations.  724 F. Supp. 2d 447, 459 (S.D.N.Y. 2010).  The court concluded that the "allegations [did] not establish what specific contradictory information the Individual Defendants received or when they received it," and "identifie[d] no specific report on 30–day delinquency rates or housing market information showing that the Individual Defendants were aware their public statements

were contradicted by adverse credit data." *Id.* at 461-62 ("[I]f 'detailed' reports were circulated regularly among AMEX's senior management, CW12 should be able to identify the names and contents of these documents, or recount specific meetings at which the Individual Defendants actually received contradictory information."); *see also Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 517 (S.D.N.Y. 2007) ("[T]o survive a motion to dismiss, plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them.").  In accordance with this line of cases, the scienter allegations in Plaintiffs' amended complaint are deficient because they generally allege that Dentsply and its predecessor were aware of the unspecified contents of EDA reports based on the reporting requirements under the EDAs, without identifying particular Director Defendants who received particular EDA reports.  (*See, e.g.*, D.I. 11 at ¶ 219) ("As is clear from these meeting and reporting requirements, Sirona was always well aware of Patterson's actual and forecasted sales and progress towards satisfying the minimum purchase requirements.").

Plaintiffs allege that non-parties Slovin and Michel, in their roles as CEO and CFO of Dentsply and its predecessor, knew Patterson was overloaded with inventory as a result of the minimum purchase requirements in the EDAs.  (D.I. 11 at ¶ 217)  But even if the court were to conclude the amended complaint adequately alleges that Slovin and Michel knew of Patterson's excess inventory, "Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes." *Desimone*, 924 A.2d at 943.

Likewise, Plaintiffs cannot prevail on their contention that the Director Defendants would have learned of Patterson's excess inventory during the due diligence process prior to merger, when they presumably had an opportunity to review the EDA reports.  (D.I. 11 at ¶ 217)  The

amended pleading states that "[t]he Director Defendants would have learned of Patterson's excess inventory through the due diligence done in advance of the Merger," without referencing particular EDA reports that contained specific, conflicting data. (*Id.*)  Moreover, Delaware courts have questioned whether it is reasonable to infer that a board of directors, having gained actual knowledge of distorted financial disclosures during the due diligence process, would "nonetheless proceed with the merger." *Ash v. McCall*, 2000 WL 1370341, at *9 (Del. Ch. Sept. 15, 2000) ("[I]t is simply illogical to presume that McKesson directors would *knowingly* cause McKesson to acquire a company with significant, undisclosed earnings misstatements.").  The amended complaint offers no reason why the Director Defendants would proceed with the merger after having discovered Patterson's inventory glut.  *See id.*

Plaintiffs highlight allegations in the amended complaint identifying the numerous Director Defendants who signed the Registration Statement, which allegedly contained false and misleading statements regarding the strength of Dentsply's distribution network and the growing demand for its products.  (D.I. 18 at 22; D.I. 11 at ¶¶ 210-12, 221)  But approving public filings or signing a Registration Statement is not enough to establish a substantial likelihood of liability, absent specific allegations of the Director Defendants' direct role in preparing such disclosures. *See In re Citigroup*, 964 A.2d at 134 (allegations that the defendants reviewed the financial disclosures was not enough to show they faced a substantial likelihood of liability, absent "facts suggesting that the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions."); *Seminaris*, 662 A.2d at 1354 (declining to find that the directors faced a substantial likelihood of liability where three directors signed an allegedly misleading registration statement).

Plaintiffs also argue that knowledge can be imputed to the Director Defendants under the core operations doctrine. (D.I. 18 at 20-21) But the fact that the EDAs concerned a "core product" integral to Dentsply's business is not enough to infer that the Director Defendants knew or should have known of Patterson's excess inventory, absent specific factual allegations to that effect in the amended complaint. *See Kenney v. Gertel*, 2018 WL 4219233, at *6 (N.D. Cal. Sept. 5, 2018); *Percoco v. Deckers Outdoor Corp.*, 2013 WL 3584370, at *5 (D. Del. July 8, 2013) (rejecting core operations doctrine); *In re Express Scripts Holding Co. Sec. Litig.* 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017) ("[T]he core operations doctrine applies only when 'a plaintiff has adequately alleged that the defendant made false or misleading statements.'"). For these reasons, the allegations in the amended complaint are insufficient under the second prong of the *Caremark* analysis. *See In re Citigroup*, 964 A.2d at 126-27 (finding pleaded allegations of defendants' failure to prevent large losses and the existence of certain warning signs were not enough to establish that defendants knowingly failed to monitor risk in accordance with their fiduciary duties).

### D.    Claims for Unjust Enrichment / Corporate Waste

Defendants contend that allegations of director salaries, benefits, and unspecified bonuses are insufficient as a matter of law to establish a substantial likelihood of liability for unjust enrichment or corporate waste. (D.I. 16 at 30) Defendants further argue that pleaded allegations regarding Dentsply's stock repurchase are insufficient because they lack particularized allegations that Defendants acted with scienter in authorizing the transaction. (*Id.*)

In response, Plaintiffs repeat the argument made in support of their causes of action for breach of fiduciary duty, alleging that the Director Defendants' bad faith can be inferred from their failure to exercise oversight over Dentsply's revenues, margins, and earnings, as well as

from their anticompetitive conduct.[9]  (D.I. 18 at 32)  Without citation to authority, Plaintiffs

argue that Defendants acted in bad faith and committed corporate waste by awarding excessive

compensation to Dentsply's executives.  (*Id.*)  Plaintiffs also argue that the repurchases of

Dentsply stock at inflated market rates injured Dentsply and did not reflect a valid exercise of

business judgment.  (*Id.*)

      "A claim of waste requires the pleading of particularized facts demonstrating that the

consideration received by the corporation was so inadequate that no person of ordinary sound

business judgment would deem it worth that which the corporation paid."  *Taylor v. Kissner*, 893

F. Supp. 2d 659, 673 (D. Del. 2012) (internal citations and quotation marks omitted).  Corporate

waste is "confined to unconscionable cases where directors irrationally squander or give away

corporate assets."  *Brehm,* 746 A.2d at 263.

      The amended complaint alleges that Defendants committed corporate waste by paying

excessive compensation and bonuses and by awarding self-interested stock options to certain

officers and directors.  (D.I. 11 at ¶ 313)  Plaintiffs' claim for unjust enrichment also rests on

allegations that the Director Defendants benefited from salaries, bonuses, and other forms of

compensation at Dentsply's expense.  (*Id.* at ¶ 309)  Courts have rejected similar allegations that

recipients of compensation were unjustly enriched and committed waste by receiving payment

while breaching their fiduciary duties.  *See In re Bank of N.Y. Mellon*, 991 F. Supp. 2d at 463-64

(finding no reasonable doubt that the decision to pay allegedly wrongdoing officers was a valid

exercise of business judgment where the plaintiffs failed to allege the board was aware of

---

[9] By repeating the arguments raised in support of their claims for breach of fiduciary duty,
Plaintiffs essentially "concede[ ] the unjust enrichment and corporate waste claims are
'inexorably linked' to the breach of fiduciary duty claim[s]."  *In re Bank of N.Y. Mellon Corp.
Forex Transactions Litig.*, 991 F. Supp. 2d 457, 463 (S.D.N.Y. 2013).  For the reasons
previously stated at § IV.C, *supra*, the amended complaint does not adequately plead that the
Director Defendants were aware of any wrongful activity.  *See id.*

wrongful activity); *see also Cent. Laborers' Pension Fund v. Dimon*, 2014 WL 3639185, at \*5 (S.D.N.Y. July 23, 2014) ("[T]he unjust enrichment claim fails because the 'only enrichment alleged by plaintiffs consists of defendants' salaries, benefits, and unspecified bonuses.'" (quoting *In re Pfizer Inc. S'holder Derivative Litig.,* 722 F.Supp.2d 453, 465 (S.D.N.Y. 2010)). Consequently, the amended complaint lacks particularized allegations giving rise to a reasonable doubt that the challenged compensation levels were the product of a valid business judgment. *See In re Goldman Sachs*, 2011 WL 4826104, at \*16.

Allegations that Defendants committed waste by causing Dentsply to repurchase shares of its own stock at excessive prices are also deficient. The amended complaint states that "Dentsply would not have purchased its securities at artificially inflated prices had the Director Defendants disclosed all material information known to them or that was so obvious it should have been known to them." (D.I. 11 at ¶ 262) For the reasons explained at § IV.C.2, *supra*, the amended complaint does not plead with particularity that the Director Defendants acted with scienter in their assessment of Dentsply's financial condition. "When directors, acting without scienter, authorize a stock repurchase at market price—even if that price was artificially inflated—there is no claim for corporate waste because 'ordinary and rational businesspeople [ ] trading the stock' concluded that the stock was worth the market price." *Staehr v. Miller*, 2010 WL 11030716, at \*10 (S.D. Fla. Mar. 31, 2010) (quoting *In re Citigroup,* 964 A.2d at 137).

### E. Claims for Violations of Securities Laws

#### 1. Heightened pleading standard

Defendants argue that Plaintiffs' derivative claims for violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") should also be dismissed for failure to make a pre-suit demand for the same reasons discussed in connection with Plaintiffs'

*Caremark* claim.  (D.I. 16 at 31)  Because the amended complaint sounds in fraud, Defendants allege that dismissal is warranted for failure to state with particularity the requisite scienter for each defendant.  (*Id.* at 32-33)

In response, Plaintiffs contend that the amended complaint adequately states a claim under Section 10(b) based on Defendants' knowing dissemination of false and misleading information regarding the stock repurchases at artificially inflated prices.  (D.I. 18 at 30) Plaintiffs reiterate the pleaded allegations regarding the Distributors' anticompetitive conduct and Patterson's inventory stockpiling to establish Defendants' "knowing or reckless" state of mind.  (*Id.* at 30-31)  Plaintiffs do not address the merits of the Section 14(a) claim.

I recommend dismissal of Plaintiffs' federal securities claims for failure to satisfy the particularity requirement under Rule 23.1.  (D.I. 23, Ex. A at 75:16-24) (concluding that demand requirement extends to causes of action under Section 14(a)).  Moreover, the federal securities claims are largely based on the same deficient factual allegations underlying the *Caremark* claims, amounting to "an impermissible repackaging of deficient state law claims."  (D.I. 23, Ex. A at 75:25-76:12)  In support of their Section 10(b) claim, Plaintiffs point to a series of pleaded allegations in the amended complaint regarding the consummation of the merger despite Patterson's inventory stockpile and the Distributors' anticompetitive scheme, and the resulting negative financial impact on Dentsply.[10]  (D.I. 18 at 31)  These same allegations form the basis of Plaintiffs' failure of oversight claims under *Caremark*.  *See* § IV.C, *supra*.  The law is well-

---

[10] Plaintiffs' bullet-point list of pleaded allegations does not satisfy the particularity requirements of the heightened pleading standards.  Instead, the list rehashes facts regarding the significance of Patterson's excess inventory, (D.I. 11 at ¶¶ 114, 127, 229); the Distributors' efforts to eliminate competition, (*id.* at ¶¶ 142-44); and the magnitude of the financial losses and impairment charges as well as the impact on Dentsply's core operations, (*id.* at ¶¶ 153, 228-29). Among other deficiencies described herein, these allegations do not identify specific acts of wrongdoing by individual Defendants.  (D.I. 23, Ex. A at 68:2-18)

established that bootstrapping a federal securities claim to a cause of action for breach of fiduciary duty is not permissible. *See Halpert Enters., Inc. v. Harrison*, 2005 WL 1773686, at *3 (S.D.N.Y. July 26, 2005) ("Given the absence of any specific allegations against any individual defendant for actively engaging in any wrongdoing, Halpert's Section 14(a) claim amounts to nothing more than an attempt to dress up an ordinary state breach of fiduciary duty claim in federal securities law clothing, a maneuver that the caselaw plainly prohibits.").

Plaintiffs' federal securities claims are also deficient under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b). To state a claim for violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). A plaintiff alleging securities fraud must adhere to the heightened pleading requirements imposed by the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006). Rule 9(b) requires plaintiffs to "support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the "who, what, when, where and how' of the events at issue." *In re Rockefeller Center Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (quoting *In re Burlington Coat Factory*, 114 F.3d at 1422).

The allegations cited by Plaintiffs lack the requisite particularity under this standard. "[P]laintiffs may not make general allegations of scienter against a collective group of

defendants; they must 'specify the role of each defendant, demonstrating each defendant's involvement in misstatements and omissions.'" *City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*, 686 F. Supp. 2d at 420-21 (quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 335-36 (3d Cir. 2007)).  Here, the amended complaint does not address the role of each Director Defendant individually in advancing the alleged misstatements or omissions regarding Patterson's excess inventory or the Distributors' anticompetitive scheme.  *See* § IV.C.2, *supra*. Instead, the federal securities claims amount to "an impermissible repackaging of deficient state law claims."  (D.I. 23, Ex. A at 75:16-77:4)

Plaintiffs argue that a holistic assessment of additional allegations leads to a strong inference of scienter, including the resignation of Dentsply's four top executives, the negative impact on Dentsply's core operations, and the magnitude of Dentsply's write-downs, losses, and impairment charges.[11]  (D.I. 18 at 31)  But "allegations of a company's core operations, GAAP violations, and removal of its executives . . . cannot establish scienter independently."  *New Orleans Employees Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (citing *Novak*, 216 F.3d at 309; *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 176-77 (S.D.N.Y.2003)). Moreover, courts have held that the magnitude of impairment charges is insufficient to independently infer knowledge.  *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009) ("[I]t is well established that 'the size of the fraud alone does not create an inference of scienter.'" (quoting *In re WorldCom, Inc. Sec. Litig.*, 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003)), *aff'd*, *Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

---

[11] *See* n.10, *supra*.

Consequently, I recommend dismissal of Plaintiffs' causes of action under Sections 14(a) and 10(b) of the Exchange Act.

### 2. Timeliness

Defendants also challenge the timeliness of Plaintiffs' federal securities claims.  For the reasons previously stated, the court recommends dismissal of all claims in the amended complaint for failure to satisfy the demand futility requirements of Rule 23.1.  Nonetheless, the court addresses Defendants' alternative arguments based on timeliness to the extent that the analysis is relevant to Plaintiffs' request for leave to amend.  (D.I. 18 at 35 n.22)

### a. Section 14(a)

Defendants contend that Plaintiffs' Section 14(a) claim is barred by the applicable three-year statute of repose because Dentsply filed a joint proxy statement seeking stockholder approval of the merger on December 8, 2015, more than three years before this litigation was filed on April 29, 2019.  (D.I. 16 at 34)  In response, Plaintiffs contend that the allegations under Section 14(a) are timely because Defendants disseminated allegedly false or misleading proxy statements on April 13, 2017 and April 9, 2018.  (D.I. 18 at 35)

"[F]or § 14(a) claims, the statute of repose begins to run on the date the proxy statement was issued."  *Dekalb Cty. Pension Fund v. Transocean Ltd.*, 36 F. Supp. 3d 279, 285 (S.D.N.Y. 2014), *aff'd*, 817 F.3d 393 (2d Cir. 2016).  Plaintiffs do not dispute that its Section 14(a) claim is barred by the statute of repose to the extent that the claim is based on alleged misrepresentations in the December 7, 2015 and April 15, 2016 proxy statements.  (D.I. 11 at ¶¶ 331-32)  Therefore, Plaintiff's Section 14(a) claim is barred by the statute of repose to the extent that the claim is based on false or misleading statements in the 2015 and 2016 proxy statements.

Defendants further argue that Plaintiffs' Section 14(a) claim based on the 2017 proxy statement is barred by the one-year statute of limitations because Plaintiffs discovered the allegedly false statement or omission more than one year before bringing the instant claims. (D.I. 16 at 34)  According to Defendants, Plaintiffs admit that they were on notice of the alleged misrepresentations regarding Patterson's excess inventory as of the August 9, 2017 disclosure. (D.I. 20 at 20)

"[A]ny claim made pursuant to Section 14(a) must be brought within one year of the discovery of the violation." *Take–Two Interactive Software, Inc. v. Brant*, 2010 WL 1257351, at *5 (S.D.N.Y. 2010).  To the extent that Plaintiffs' Section 14(a) claim is based on alleged misrepresentations in the 2017 and 2018 proxy statements, those allegations are time-barred under the one-year statute of limitations.  Plaintiffs concede that they could have alleged a material misstatement or omission regarding excess inventory at Patterson as of the August 9, 2017 disclosure of the impairment charge, when Dentsply's stock price fell more than 8%.  (D.I. 18 at 33-34; D.I. 11 at ¶¶ 227, 240)  Moreover, the FTC complaint regarding the Distributors' anticompetitive conduct was filed in February 2018, more than one year before the complaint in this action was filed on April 29, 2019.  (D.I. 11 at ¶ 137) ("Indeed, the full scope of the conspiracy was not revealed until February 12, 2018, when the Federal Trade Commission ("FTC") filed a complaint against Patterson, Schein and Benco.").  For these reasons, Plaintiffs' cause of action under Section 14(a) is time-barred.

### b.  Section 10(b)

Defendants contend that Plaintiffs' Section 10(b) claim is also barred by the applicable two-year statute of limitations, which began to run when Plaintiffs discovered or should have discovered facts showing that Defendants allowed Dentsply to repurchase shares of stock at

artificially inflated prices.  (D.I. 16 at 35)  In response, Plaintiffs allege that the Section 10(b)

claim is timely because they could not have discovered the necessary facts to assert the claim

until Dentsply announced a $1.1 billion impairment charge on August 9, 2017, and this

disclosure provided the first notice to investors of the excess inventory being held by Patterson.[12]

(D.I. 18 at 33-34)

At this stage of the proceedings, the court cannot conclude that the statute of limitations

bars Plaintiffs' claim under Section 10(b) of the Exchange Act.  The amended complaint states

that,

> [o]nly when the Company was forced to disclose the true impact of the schemes
> that had served in the past to prop up its reported revenues, earnings and margins
> did investors learn that Dentsply Sirona's projected growth could not be
> sustained. Thus, for example, in August 2017, when Dentsply Sirona incurred a
> $1.17 billion impairment charge, it reduced its 2017 EPS guidance to a range of
> $2.65-$2.70 after previously projecting a range of $2.80-$2.90. Also, when, in
> August 2018, the Company incurred a $1.265 billion impairment charge, it
> reduced 2018 EPS guidance to a range of $2.00-$2.15 after previously projecting
> a range of $2.70-$2.80 just six months earlier.

---

[12] Plaintiffs present two additional arguments, neither of which is compelling.  First, Plaintiffs'
collateral estoppel argument fails because the New York Supreme Court's analysis applied to
claims brought under Sections 11 and 12(a)(2) of the Securities Act of 1933, which has a one-
year statute of limitations from the date of discovery of the untrue statement or omission.  *See
Dentsply Sirona*, 2019 WL 4692754, at *3.  Moreover, the New York Supreme Court's
discussion of the statute of limitations was not necessary to the decision; instead, the court
deferred resolution of the statute of limitations issue and dismissed the pleading on other
grounds.  *Id.* ("Defendants have raised issues of fact regarding when the statute began to run that
will be addressed at a later stage if this litigation proceeds.").  Second, the court finds no support
for Plaintiffs' position that the statute of limitations was tolled by the filing of a complaint in a
class action lawsuit on December 19, 2018 in the Eastern District of New York.  In *American
Pipe & Construction Co. v. Utah*, the Supreme Court held that "the commencement of the
original class suit tolls the running of the statute for all purported members of the class who
make timely motions to intervene after the court has found the suit inappropriate
for class action status."  414 U.S. 538, 553 (1974).  A review of the record in the Eastern District
of New York shows that Dentsply is not a member of the putative class.  (E.D.N.Y. C.A. No. 18-
7253).

(D.I. 11 at ¶ 155)  Accepting these allegations as true, the amended complaint establishes that the discovery was made within two years of the filing of this action.  Plaintiffs are not required to do more at this stage of the litigation.  *See Duncan v. Vantage Corp.*, C.A. No. 18-288-MN, 2019 WL 1349497, at *6 (D. Del. Mar. 26, 2019) (concluding that the action was not barred by the limitations period where the plaintiff pleaded that the discovery was made within the limitations period and the statute of limitations defense did not otherwise appear on the face of the complaint); *see also Pension Tr. Fund for Operating Engineers v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 271 (3d Cir. 2013) ("[B]ecause a statute of limitations is an affirmative defense, the burden of establishing its applicability to a particular claim rests with the defendant." (internal quotation marks and citations omitted)).

Although Plaintiffs' cause of action under Section 10(b) of the Exchange Act is not time-barred at this stage of the litigation, dismissal of the claim is warranted for the reasons set forth at § IV.E.1, *supra*.

### F.  Failure to State a Claim

Having recommended dismissal under Rule 23.1 for failure to plead demand futility, the court need not reach Defendants' alternative argument for dismissal under Rule 12(b)(6).  *See In re Chemed Corp.*, 2015 WL 9460118, at *23; *N.J. Bldg. Laborers Pension Fund v. Ball*, C.A. No. 11-1153-LPS-SRF, 2014 WL 1018210, at *2 n.3 (D. Del. Mar. 13, 2014); *Abrams v. Wainscott*, C.A. No. 1-297-RGA, 2012 WL 3614638, at *4 (D. Del. Aug. 21, 2012).

## V.      CONCLUSION

For the foregoing reasons, I recommend that the court GRANT Defendants' motion to dismiss with prejudice.[13]  (D.I. 15)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The objections and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: July 31, 2020                                    _____
                                                        Sherry R. Fallon
                                                        UNITED STATES MAGISTRATE JUDGE

---

[13] Plaintiffs have amended the pleading once as a matter of right, and they offer no explanation in their footnote as to how any defects could be cured.  (D.I. 18 at 35 n.22; *see* D.I. 23, Ex. A at 77:12-20)